[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 21, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15497
Non-Argument Calendar

_____

Agency Nos. A98-710-597
A98-710-598

KATIA ROMERO LAMUS,
JESUS GUILLERMO SALAS ROMERO,
MARCO JOSE SEGNINI ROMERO,
GABRIEL ALEJANDRO SEGNINI ROMERO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 21, 2008)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Katia Romero-Lamus and her three children, citizens and nationals of Venezuela, seek review of the Board of Immigration Appeals' ("BIA") final order, affirming the Immigration Judge's ("IJ") denial of their applications for asylum, withholding of removal, and Convention Against Torture ("CAT") relief. They raise two issues on appeal. First, they argue that the IJ erred in finding that they were not credible because that finding was based only on minor inconsistencies in their testimony. Second, they argue that the IJ erred in finding that they had not met their burden of establishing eligibility for asylum, withholding of removal, and CAT relief, because Romero-Lamus's political activism was the direct cause of an attack on her son, Jesus Salas, and the threats and attacks that the petitioners suffered, taken together, amounted to past persecution.

After review of the record and briefs we find that the IJ's adverse credibility determination is supported by specific, cogent reasons and substantial evidence, and the record therefore does not compel a contrary finding. Also, the petitioners failed to establish that their alleged ill-treatment rose to the level of persecution, particularly as their testimony was inconsistent and implausible, and they failed to submit corroborating evidence. Accordingly, we DENY the petitions for review.

## I. BACKGROUND

Katia Romero-Lamus and two of her three children were admitted into the United States as non-immigrant B-2 visitors on or about 28 July 2004, with permission to remain until 27 January 2005. See AR at 354, 491, 504. Romero-Lamus's third child, Jesus Salas Romero, was admitted on or about 4 December 2004, as a non-immigrant B-1 visitor, with permission to remain until 1 March 2005. See id. at 478. On 16 January 2005, Romer-Lamus, the lead petitioner, applied for asylum, withholding of removal and CAT relief. Id. at 289-300. Jesus Salas Romero applied for asylum on 6 July 2005. Id. at 428-438.

In her application, Romero-Lamus stated that she was seeking asylum based on her political opinion and membership in a particular social group, as she feared for her own and her children's lives, should they be returned to Venezuela, because they had received death threats from followers of Hugo Chavez resulting from the public expression of her political opinions. Id. at 293. She described her work and the resultant threats to her and her family. Romero-Lamus stated that she was persecuted because of her political opinion, "for working for social justice, freedom of ideals[,] as well [as] the principles of a democratic society and human rights." Id. She was a sympathizer with the political party, Accion Democratica, a member of the Student Center of the Law School since 1979, and a

3

judicial consultant for Neighbors Association of Sabana Grande since 2000. Id. at 294.

In Jesus Salas Romero's ("Salas") application for asylum, which was consolidated with Romero-Lamus's application, Salas stated that his mother had worked as an attorney, belonged to several organizations, was vocal against the Chavez regime, and was threatened by the "Circulos Bolivarianos" where she lived. Id. at 432. On one occasion, a gun was pointed at Romero-Lamus by two men, wearing T-shirts that showed their support for Chavez, but Romero-Lamus was able to get into her car and get away from them. Id. Salas's brother, Marcos, also had been threatened, and remained traumatized by an incident in which a man had pointed a gun at him from a window opposite his own while Marcos had engaged in a protest against Chavez's televised speech. Id.

Salas also was threatened when, on 24 July 2004, he was reporting on the Birth of Bolivar festivities for his University's television station. Id. at 438. Salas was hit by a group of Chavez supporters who appeared to know who he was, and who took away and broke his camera. Id. As Salas was leaving the festivities, a car occupied by two men stopped in front of him, and one of the men asked him if he was Jesus Salas. Id. When Salas replied yes, one of the men forced him into the back seat of the car, sat next to him, and began questioning the whereabouts of

4

his mother.  Id.  Salas told them that Romero-Lamus was in Caracas, despite the fact that she actually was in Maracaibo, to which the men responded by pulling out a gun, stating that Romero-Lamus was not in Caracas, and if Salas did not tell them where she was, they would kill him.  Id.  Once the men realized that Salas had nothing more to say, they warned him to "take care of [his] siblings and [his] mother and to take care [that] she did not continue her activities."  Id.  The men took Salas's identification, drove him to a neighborhood in Maracaibo, and left him there, and after this incident, Romero-Lamus began making plans to move her family out of Venezuela.  Id.  Salas stated that he feared that, if he and his family were returned to Venezuela, they would be threatened and placed in grave danger because he, his mother, and Marcos each had been threatened at gun-point, and Chavez's government was gaining power.  Id. at 432.  He feared being tortured if he returned to Venezuela because persecution by the Chavez government is continuing to escalate.  Id. at 433.

With their applications, Romero-Lamus and Salas submitted several exhibits, including a letter from Carlos Andres Agelvis, the president and founding member of Neighborhood Association of Sabana Grande, who attested that he knew Romero-Lamus, who, from July of 1998 through July 2004, had worked as the organization's legal advisor, representing members of the

Association before justice tribunals, and working to bring the community together in defense of their rights. Id. at 192. Another letter, from the general secretary of Accion Democratica, stated that Romero-Lamus had been a collaborator with Accion Democratica for more than 24 years, "showing dignified conduct of all responsibilities." Id. at 196.

The record also contained reports on human rights practices in Venezuela. The U.S. Department of State's Country Report on Venezuela's Human Rights Practices in 2004 stated: (1) "[i]n July 2000, voters elected President Hugo Chavez . . . in generally free and fair elections;" (2) the government's human rights record remained poor, and the government intimidated its political opponents; (3) "President Chavez, officials in his administration, and members of his political party consistently attacked the independent media, the political opposition, labor unions, the courts, the Church, and human rights groups;" and (4) government supporters "threatened, intimidated, and physically harmed at least dozens of individuals opposed to Chavez during the year." Id. at 263-64. A 2005 report by Amnesty International stated that "[p]olitical polarization continued to destabilize Venezuela," and "[t]here were violent confrontations between supporters of the opposition and the security forces throughout the country." Id. at 282.

6

At their removal hearing, Romero-Lamus conceded removability for herself and her children. Id. at 100-01. At the continuation of the removal hearing, Romero-Lamus's testimony was substantially the same as the information that she had provided in her application. In addition, she testified that she began working with the Democratic Action Party in 1980, organizing activities such as marches to oppose the government. Id. at 109-10. She testified that Chavez was elected president in 1998 and took office in 1999. Id. at 112. Romero-Lamus began engaging in opposition activities in July of 2000, when she realized that the Chavez regime was turning into a totalitarian regime, "so [she] started having meetings in [her] office in order to attract the community." Id. at 112-13. Ten to 20 people, including members of the Sabana Grande Neighbors Association, and its president, Mr. Carlos, attended these meetings. Id. at 114.

Romero-Lamus testified that, as a result of these meetings, she began experiencing problems. Id. at 115. After the first huge march in opposition to Chavez took place on 11 April 2002, Romero-Lamus began receiving phone calls at her office from the "Revolucion Bonita," telling her to stop holding meetings and "to be very careful about [her life]." Id. Romero-Lamus received approximately seven "worrisome" phone calls between April and July 2002. Id. at 116. Despite finding that her office door had been glued shut and her window

7

vandalized, Romero-Lamus continued working from her office. Id. at 117. However, because the calls were growing in frequency and targeting her specifically, Romero-Lamus began working from home in July 2002. Id. at 117-18. Once Romero-Lamus was working from home, several months passed without the receipt of any personal threats. Id. at 119. However, "apparently they realized where [she] was living," because on several occasions, beginning in December 2003, she found that her car had been broken into or tampered with. Id. In December 2003, she found that all of her tires were flat, and around February of 2004, she discovered that acid had been spilled on her car battery. Id.

On 30 July 2003, while Romero-Lamus's children were banging pots in protest to Chavez's televised speech, her son, Marcos, spotted a man in a window across the courtyard pointing a gun at him. Id. at 120. As soon as the man saw Romero-Lamus, he hid. Id. Romero-Lamus did not report the incident to the police because she was afraid, and she had tried to report the phone calls and car incidents, but had not received any help. Id. at 121.

Romero-Lamus testified that she first came to the United States with her two youngest children on 8 August 2003, staying until January 2004. Id. at 122. Salas had remained in Venezuela because he was attending school in Maracaibo. Id. When Romero-Lamus returned to Caracas, her children went to live with their

8

father about an hour away because she was afraid due to the incident with Marcos. Id. at 123. Romero-Lamus returned to her apartment and began attending marches and political meetings again. Id. On 27 February 2004, Romero-Lamus returned home from a political meeting to find that her apartment was open, and "everything was out of place." Id. at 124. The next day, she received a phone call from a man identifying himself as "Los Compotliantos," meaning, "the country men," which is how people from the Chavez regime identify themselves, who told Romero-Lamus to "take care of [her] life" if she did not want to die, and when Romero-Lamus went to her car, she found a sign that said, "revolution or death." Id. The next day, Romero-Lamus went to her mother's house, and on 4 March 2004, she returned to the United States by herself. Id. at 125-26. She returned to Venezuela on 15 July 2004, with plans to live in Maracaibo, ten hours from Caracas, hoping that the relocation would help. Id. at 128, 131.

On 24 July 2004, Salas informed Romero-Lamus of the attack that he suffered while reporting on the demonstration for his school project. Id. at 131-32. Salas told Romero-Lamus that his attackers said that she should be careful because they could kill either of them, and they could find her anywhere. Id. at 133. According to Romero-Lamus, Salas was robbed by his attackers after they let him out of the car. Id. Romero-Lamus returned to the United States with her two

9

youngest children on 28 July 2004. Id. at 133-34. Salas followed in December of 2004, after initially hoping to stay behind in Venezuela to finish his studies. Id. at 134. Romero-Lamus did not feel that her children would be safe staying in Venezuela because they would be harmed if her persecutors discovered that they were her children. Id. at 153.

Romero-Lamus testified that Chavez took the office of president on 2 February 1999. Id. at 139. Over the IJ's assertion that the country report stated that Chavez was elected in July of 2000, she stated that he was elected in 1998, explaining that "there were some changes," and first "there was Carlos Santrez," and then "Valasquez . . . came to replace him." Id.

Salas testified that, on 24 July 2004, he attended a Chavistas march in order to complete a school assignment. Id. at 160-64. When the Chavista sympathizers saw that he had a university identification card and was taking photographs, they began pushing and verbally harassing him. Id. at 164-65. Upon leaving the march, Salas boarded what he thought was a public transportation vehicle, but once inside the vehicle, he was asked whether he was Jesus Salas and whether he knew Katia Romero. Id. at 166-67. He then was threatened and held at gun-point. Id. at 168. When the men eventually let him out of their vehicle, they told him to walk straight and not to turn around, or they would kill him. Id. Salas did as he

was told, then called his grandfather and took a taxi home.  Id.  Salas did not leave Venezuela after this incident because he still was in school and wanted to begin his career.  Id. at 168-69.  He eventually came to the United States "because things in Venezuela started getting worse.  The political situation didn't improve," and he did not believe that his family would be safe in Venezuela, although he testified that he never was threatened again after the incident at the march.  Id. at 169-70.

Salas testified that, between 1999 and 2004, his mother visited him in Maracaibo approximately ten times, and the longest that she stayed was two weeks.  Id. at 171.  Salas stated that his mother had been directly threatened by "a man that went to . . . her lawyer's office and the man pointed a weapon at her because there were some political problems."  Id.  The building security guards arrived and took the man away, but he was able to escape.  Id. at 172.

The IJ denied the petitioners asylum, withholding of removal, and CAT relief.  Id. at 61.  The IJ noted that, the "[c]ourt just cannot fathom why [Romero-Lamus] would have returned [to Venezuela] if she was still afraid."  Id. at 52.  Further, the IJ noted that, although Romero-Lamus testified that the threats were directed at her and her family, she returned to the United States without her children, leaving them with their father in Venezuela, because they were safe with

11

him, despite the fact that he "only lived an hour away in the same Caracas town." Id. at 53.

As to Romero-Lamus, the IJ found that: (1) she had failed to "provide any type of specifics as to what activities she engaged in on behalf of this group as its legal advisor which would have brought her in the fore front of individuals in favor of Hugo Chavez;" (2) she did not provide any materials to "corroborate her claim that she was ever threatened or harmed by Chavistas," and despite her submission of several letters and exhibits in support of her claims, none of these mentioned that she had suffered any difficulties in Venezuela; (3) Romero-Lamus's testimony, that she had been threatened over the phone and that her car had been vandalized, did not demonstrate persecution; and (4) Romero-Lamus "brought nothing to corroborate the claim that indeed anyone tried to harm [her] son or any other family member." Id. at 54-56. Regarding the man who allegedly pointed a gun at Romero-Lamus's son from across her apartment courtyard, the IJ stated:

> If there was ever an opportunity for [Romero-Lamus] to take an action against someone who was in a position to harm her it would seem logical that that would be the best time for her to have sought legal recourse through the police authorities. Indeed she could have contacted the police and pointed out the exact window that she saw the person pointing a weapon from and she failed to report it to the

12

authorities.  There is nothing to corroborate that this ever occurred.
Id. at 56.

The IJ also found that Romero-Lamus's account of Salas's encounter in Maracaibo with the men who held him at gun-point was "totally lacking in credibility," and Romero-Lamus "had no leadership position other than serving as a legal advisor to [the neighborhood] association."  Id.  The IJ noted that, while Romero-Lamus stated that the incident in Maracaibo involving Salas occurred in July 2004, Salas testified that it occurred in 2001, and Salas's application related an incident in which two men had waited for Romero-Lamus in a car and had pointed a gun at her, but Romero-Lamus "never gave any testimony of some men threatening her with a weapon and her fleeing in a car."  Id. at 57.  Further, Salas testified to an alleged incident in which a weapon was pointed at Romero-Lamus at her office, testimony that, the IJ noted, was "at variance with his own asylum application."  Id.

The IJ also found that Salas had "not given a credible explanation as to how he got into a vehicle mistakenly thinking that it was a public transportation and found out that there were two Chavista supporters that knew of him because of his mother," and Romero-Lamus "never tendered any evidence or explanation which would indicate indeed that [she] achieved a notoriety that would expose Jesus

13

Salas to difficulties in Mara[caibo], 10 hours away." Id. at 58. After Salas was allegedly threatened and attacked, the IJ noted, "he stayed in Venezuela until December 2004," which "belies any claim of any fear of harm in Venezuela." Id. at 59.

Accordingly, the IJ determined that the petitioners "failed to show either past persecution or a well-founded fear of persecution," and they failed to meet their burden of proof to show that anyone in Venezuela was "interested in any of them due to one of the five enumerated grounds necessary for a grant of asylum." Id. He found that both Romero-Lamus's and Salas's testimony lacked credibility, and they failed to establish that they would be "tortured by or at the instigation of or with the consent or acquiescence of a public official or a person acting in an official capacity [i]f they are returned to Venezuela." Id. at 60-61.

Romero-Lamus and Salas appealed to the BIA, arguing that the petitioners met their burden of establishing a well-founded fear of persecution. Id. at 10. The petitioners asserted that the IJ erred in determining that Romero-Lamus was not credible because she returned several times to Venezuela, as he failed to take into account everything that Romero-Lamus was abandoning by permanently leaving her country. Id. at 15. They contended that their testimony should have been found credible because it was largely consistent with their applications, and the

14

government pointed to only one alleged inconsistency in each of the petitioners' testimony, and the IJ gave such weight to these minor discrepancies as to cease acting as an impartial arbiter. Id. at 18-19. Further, they asserted, because Romero-Lamus suffered past persecution, there is a presumption that she has a well-found fear of future persecution, and when a government is "unwilling to control elements of its population that exercise violence on others, they are implicitly sanctioning these actions." Id. at 17.

The BIA affirmed the IJ's final order of removal and dismissed the petitioners' appeal. Id. at 2-3. It found that the IJ's denial of relief was based primarily on the following:

> (1) the letters proffered by the respondent to corroborate her political activities circumstances in Venezuela did not do so; (2) the respondent returned to her native country on 2 occasions undermining her claim of a subjective fear of persecution[;] and (3) the adverse credibility finding made by the Immigration Judge.

Id. at 2 (internal citations omitted). The BIA also noted that other factors impacted the IJ's denial of relief, including Romero-Lamus's failure to alert the police following the incident where a man pointed a gun at her son from across her courtyard, and the lack of corroboration as to that incident. Id., n.2.

The BIA noted that Romero-Lamus failed to address in her appeal the first two bases for the IJ's denial, instead arguing that the IJ's credibility determination

15

was in error, pointing to two segments of the removal hearing that were not "crucial to the determination of relief." Id. at 2-3 (internal citations omitted). The BIA emphasized that she did not address the "numerous inconsistencies between the asylum evidence of the lead respondent and that of her oldest son," despite the fact that the IJ "specifically noted that the lead respondent and her oldest son Jesus Romero 'cannot even get their stories together' and set forth instances when their two claims did not mesh." Id. at 3 (internal citations omitted). The BIA noted that Salas's application included an incident in which a man pointed a gun at Romero-Lamus and attempted to force her into a car, but this incident was not included in Romero-Lamus's application or testimony, and there also were discrepancies in the details surrounding the incident in Maracaibo where Salas was held at gun-point, as well as between Salas's application and his own testimony. Id. Accordingly, the BIA found that the petitioners failed to meet their burden of proof to establish eligibility for asylum, withholding of removal, and CAT relief, and they failed to present any persuasive arguments for disturbing the IJ's decision on appeal. Id.

## II. DISCUSSION

We review the BIA's decision as the final judgment, unless the BIA has expressly adopted the IJ's decision. In that situation, we review the IJ's decision

16

as well.  Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007) (internal citations omitted).  Here, because the BIA adopted the reasoning of the IJ, we review the decisions of both the IJ and the BIA.

We review the IJ's factual determinations under the substantial evidence test.  Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). We must "affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (internal quotations omitted).  Under this test, we view "the record evidence in the light most favorable to the agency's decision and draw[s] all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).  Accordingly, "to conclude the [IJ's] decision should be reversed, we must find that the record not only supports the conclusion, but compels it."  Ruiz, 479 F.3d at 765 (internal quotations omitted).

A.    **Whether substantial evidence supports the IJ's adverse credibility determination**

On appeal, the petitioners argue that the IJ's adverse credibility finding was based on a few minor points and made without a full understanding of their case. They argue that: (1) the IJ put such weight on a few minor discrepancies as to

damage disproportionately the petitioners' credibility; (2) the IJ erred in finding Romero-Lamus not credible based on her act of returning to Venezuela because her return demonstrated only that she maintained hope that the situation in Venezuela would improve, and the IJ should have considered the result of her return; (3) Salas's testimony that the attack in Maracaibo occurred in 2001, rather than 2004, was a simple error, and the IJ erred by choosing to accept the clearly erroneous date, which was the only discrepancy in Salas's story; and (4) the IJ erred in finding that Salas's valid explanation as to how he mistakenly boarded what he believed to be a public transportation vehicle lacked credibility. Further, they contend, Romero-Lamus explained that she had held meetings in her office in Caracas, which led to her notoriety in Maracaibo such that Salas was attacked there for being her son. Also, Romero-Lamus's failure to report the incident in which a man pointed a gun at her son was not a valid basis for an adverse credibility finding, as Romero-Lamus testified that she did not report the incident because she was afraid, and she had attempted to report the phone calls and car incidents to no avail.

Credibility determinations, like other factual findings, are reviewed under the substantial evidence test. Forgue, 401 F.3d at 1286. "[T]he trier of fact must determine credibility, and this court may not substitute its judgment for that of the

18

[IJ] with respect to credibility findings." Id. (internal quotations omitted). "The asylum applicant must establish eligibility for asylum by offering credible, direct, and specific evidence in the record." Id. at 1287. Credible testimony of an applicant alone is sufficient to establish these factors. Id. "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. "The weaker an applicant's testimony . . . the greater the need for corroborative evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). If the applicant introduces other evidence of persecution, the IJ must consider that evidence, "and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Forgue, 401 F.3d at 1287. "Further, the IJ must offer specific, cogent reasons for an adverse credibility finding. Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." Id. (internal quotations and citations omitted). Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995).

In analyzing adverse credibility determinations, some circuits have held that discrepancies in the petitioner's testimony must involve the "heart of the asylum

19

claim." Ceballos-Castillo v. INS, 904 F.2d 519, 520 (9th Cir. 1990); see also Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Even a single inconsistency that goes to the heart of an applicant's asylum claim, such as the basis of his fear, may be sufficient to support an adverse credibility finding. See Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001). Alternatively, pursuant to the REAL ID Act of 2005 ("RIDA"), Congress has directed immigration courts to base credibility determinations on the totality of the circumstances, which may include inaccuracies or falsehoods that do not go to the "heart of the applicant's claim." Pub. L. No. 109-13, 119 Stat. 231, § 101(a)(3). We have not adopted either standard in a published opinion. The RIDA does not apply in this case.[1] However, we need not determine this issue because the petitioners' claims fail under either standard.[2]

Here, record evidence demonstrates that the IJ's adverse credibility determination was based on specific, cogent reasons that went to the "heart" of the

---

[1] The RIDA amended credibility determinations, adding INA §§ 208(b)(1)(B)(iii), 240(c)(4)(C), 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C). Section 101(a)(3) and (d), Pub. L. No. 109-13, 119 Stat. 231, 303-05. The Act states that these provisions "shall apply to applications for asylum, withholding, or other relief from removal made on or after" the date of enactment of the Act, 11 May 2005, and, thus, the provisions do not affect this appeal. See Pub. L. No. 109-13, 119 Stat. at 305.

[2] See, e.g., Valderrama v. U.S. Att'y Gen., 180 Fed.Appx. 122, 125-26 (11th Cir. 2006) (discussing both standards of review).

petitioners' claims. See Gao, 299 F.3d at 272; Forgue, 401 F.3d at 1287. The record indicates that the IJ denied the petitioners' applications, in part, because, based on inconsistencies in their testimony and applications regarding several incidents forming the basis of their claims, and a lack of detailed, supporting evidence, he did not find them credible. See id. at 54-61. That determination is supported by substantial evidence.

The incidents forming the basis of the petitioners' applications are: (1) approximately seven threatening phone calls between April and July of 2002; (2) Romero-Lamus's office door was glued shut, and the message, "Live the revolution, lawyer," was left on her window; (3) her car was vandalized; (4) a man pointed a gun at Romero-Lamus's son from across her apartment courtyard; (5) Romero-Lamus's apartment was ransacked; and (6) Salas was held at gun-point in Maracaibo. See AR at 116, 119-20, 124, 131-33, 299-300, 432, 438. With regard to several of these incidents, the record shows inconsistencies in the testimony and applications of Romero-Lamus and Salas.

First, Romero-Lamus stated in her asylum application that Salas was attacked in Maracaibo while attempting to report on a Chavista demonstration, and Salas then boarded what he thought was a public transport vehicle, only to discover two men who ultimately pulled a gun on him, threatened him, and

21

inquired into Romero-Lamus's whereabouts. See id. at 299-300. At the removal hearing, Romero-Lamus testified to the same events, adding that Salas was robbed by his attackers after they let him out of the car. See id. at 131-33. In contrast, Salas's asylum application stated that he was hit by several Chavista supporters, who appeared to know who he was, and who took and broke his camera. See id. at 438. As he left the demonstration, he was stopped by a car occupied by two men, who asked him if he was Jesus Salas, and when he replied yes, they forced him into their car. See id. Salas later testified at the removal hearing, however, not that he had been stopped by the men and forced into their car, but that he had boarded what he believed to be a public transportation vehicle, only to discover that it was a car occupied by two men who knew him as the son of Romero-Lamus. See id. at 166-68. Despite these inconsistencies in the petitioners' accounts, they offered no corroborating evidence to rehabilitate their claim, and the IJ thus properly determined that their accounts of this event were "totally lacking in credibility." See id. at 56.

Further, Salas's application and testimony related incidents in which Romero-Lamus allegedly was held at gunpoint. Salas's application stated that, on one occasion, two men in a car pointed a gun at her, but she was able to get into her car and escape. See id. at 432. His oral testimony indicated that Romero-

Lamus had been held at gun-point in her office-building, and when security arrived to help her, the gunman escaped. See id. at 171-72. Romero-Lamus, however, offered no testimony or evidence relating to such incidents. See generally id. at 109-56, 298-300. The IJ noted that Salas's oral testimony was at variance with his own asylum application with regard to these alleged events, as well as the testimony of Romero-Lamus. See id. at 57.

In making his adverse credibility finding, the IJ also found that (1) Romero-Lamus had not explained how she had achieved such notoriety in Maracaibo, which is ten hours away from Caracas, that her son would be attacked there; (2) Salas did not credibly explain how he got into a vehicle that he mistakenly believed was public transportation, only to discover that there were two Chavista supporters inside who knew him because of his mother; and (3) Salas's decision to remain in Venezuela after the attack in Maracaibo belied any claim of fear of remaining in Venezuela. See id. at 58-59. The IJ also noted that, while Romero-Lamus stated that the Maracaibo incident occurred in July 2004, Salas testified that it occurred in July 2001. See id. at 57. The explanation offered by the IJ for his adverse credibility finding thus amounted to a list of specific, cogent reasons for his determination.

Further, the record also shows, as the IJ noted, a lack of detailed evidence supporting the petitioners' claims. The petitioners submitted no evidence corroborating any of the events on which their claims of persecution were based. See generally, id. at 181. Despite introducing letters from the Neighbors Association and the Democratic Action Party, the letters failed to reference any difficulties, let alone persecution, suffered by the petitioners. See id. at 192, 196. The letter from the president of the Democratic Action Party did not mention that he, as president, or any other member, had experienced threats or intimidation, despite Romero-Lamus's testimony that he attended the meetings. See id. at 114-15, 196. Regarding the incident in which a man pointed a gun at Romero-Lamus's son from across her apartment courtyard, the IJ found that Romero-Lamus had submitted no evidence in support of that claim, and "[i]f there was ever an opportunity for [Romero-Lamus] to take an action against someone who was in a position to harm her it would seem logical that that would be the best time for her to have sought legal recourse through police authorities." See id. at 56. He noted that Romero-Lamus "could have contacted the police and pointed out the exact window that she saw the person pointing a weapon from and she failed to report it to the authorities. There is nothing to corroborate that this ever occurred." See id.

24

Although the petitioners argue that the IJ's adverse credibility determination was based on minor inconsistencies and discrepancies, a review of the record shows that the IJ's decision was supported by substantial evidence, and the IJ enumerated specific, cogent reasons for his finding. Forgue, 401 F.3d at 1287. The petitioners have not shown that the record compels a reversal of the IJ's adverse credibility determination. Accordingly, we AFFIRM the decision of the BIA on this claim.

**B.** **Whether substantial evidence supports the IJ's finding that the petitioners were ineligible for asylum, withholding of removal, and CAT relief**

On appeal, the petitioners argue that the IJ erred in downplaying Romero-Lamus's role as a legal assistant for Neighbors Association of Sabana Grande, while ignoring the fact that she was highly visible due to her recruiting activities for the meetings held in her office. They assert that Romero-Lamus's status within this organization was the direct cause of the attack on Salas in Maracaibo, and further, the incidents to which Romero-Lamus and Salas testified, taken together, amount to past persecution, and a rebuttable presumption of future persecution thus applies. They noted that the record contains no evidence, nor did the government suggest, that the conditions in Venezuela had improved such that the petitioners could return without fear of persecution, and the petitioners

25

demonstrated that they could not safely relocate within that country. Petitioners thus argue that they met their burden of establishing eligibility for asylum and withholding of removal.

The Attorney General or Secretary of Homeland Security has discretion to grant asylum if the alien meets the definition of "refugee," as defined by 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A). A refugee is defined as:

> any person who is outside any country of such person's nationality, or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory ''refugee'' status, and thereby establishing asylum eligibility. Al Najjar, 257 F.3d at 1284. "To establish asylum [eligibility] based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. U.S. Atty. Gen., 448 F.3d 1229, 1236 (11th Cir. 2006). "To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected

26

ground." Id. (internal and quotation marks omitted). A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. Sepulveda v. U.S. Atty. Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

We have stated that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (internal quotations omitted). However, we have held that escalating physical assaults and verbal threats, cumulatively, may qualify as persecution. See Mejia v. U.S. Atty. Gen., 498 F.3d 1253, 1257-58 (11th Cir. 2007); Delgado v. U.S. Atty. Gen., 487 F.3d 855, 861-62 (11th Cir. 2007).

In the instant case, the IJ's decision to deny the petitioners relief, affirmed by the BIA, is supported by reasonable, substantial, and probative evidence on the record considered as a whole. See Al Najjar, 257 F.3d at 1284. First, as noted above, the record shows that the petitioners presented no evidence corroborating any of the alleged persecutory incidents. Second, even had they presented such evidence, the incidents to which they testified did not rise to the level of persecution. See Sepulveda, 401 F.3d at 1231. While we have held that physical violence, together with verbal threats, may qualify as persecution, here the petitioners offered no evidence of suffering physical violence, and, regardless,

they lacked consistency and credibility in relating those incidents. See Mejia, 498 F.3d at 1257-58. Further, Salas testified that, after the incident in Maracaibo, he never was threatened again. See AR at 169-70. The remaining incidents forming the basis of petitioners' claims, the vandalism to Romero-Lamus's car, the "worrisome" phone calls, the break-in at her apartment, and her office door being glued shut, accompanied by a message on her window, did not amount to the kind of extreme treatment understood to constitute persecution. See Silva, 448 F.3d at 1237 (holding that the receipt of anonymous threats, over a two-month period, did not constitute persecution); see also Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1174-76 (11th Cir. 2008) (holding that a beating, resulting in a two-day hospital stay, and the need for two weeks' rest, did not rise to the level of persecution, and a likelihood that a minor beating will recur also failed to establish a well-founded fear of persecution).

While Romero-Lamus asserts that her high visibility as a political activist led to her problems, the IJ's determination, that the petitioners failed to establish that any ill-treatment that they suffered was on account of a protected ground, is supported by substantial evidence. See AR at 59. Romero-Lamus stated in her asylum application that she was threatened to "live the revolution" or suffer the consequences. See id. at 299. However, it is notable that one of these alleged

threats occurred at her office, and yet, the letter from Neighbors Association, whose members attended meetings at Romero-Lamus's office, and the letter from the president of the Democratic Action Party, who himself attended these meetings, each failed to reference this incident. See id. at 192, 196, 299-300. Further, as the IJ noted, the petitioners failed to offer any corroborating evidence as to how the attack on Salas in Maracaibo was related to his mother's organizing and recruiting activities ten hours away in Caracas. See id. at 58-59. Again, the letters submitted by the petitioners do not mention that Romero-Lamus had attained any such high visibility or leadership role. See id. at 192, 196. Moreover, Romero-Lamus stated that she took her children to live with their father an hour from Caracas because she was afraid for them, and they would not be at risk there. See id. at 123, 300. If Romero-Lamus's highly visible political activity was a threat to her son when he was ten hours away from Caracas, in Maracaibo, it would appear that her political activities in Caracas also would gave threatened her children when they were living with their father only one hour away.

Based on the foregoing, substantial evidence supports the IJ's and BIA's conclusions that the petitioners did not establish eligibility for asylum, based on their lack of credibility and their failure to prove that they suffered past persecution or had a well-founded fear of future persecution.

## III. CONCLUSION

For the reasons stated above we find and conclude that: (1) the IJ's adverse credibility determination is supported by specific, cogent reasons and substantial evidence, and the record does not compel a contrary result; and, (2) the petitioners failed to carry their burden to establish that their ill-treatment rose to the level of persecution. Accordingly, the petitions are DENIED.

**PETITION DENIED.**