[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27, 2009
THOMAS K. KAHN
CLERK

No. 08-13609
Non-Argument Calendar
_____

Agency Nos. A99-550-276
A99-547-998

JESUS ALFONSO FERRER MARCANO,
PATRICIA MYRIAM UROSA URDANETA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(February 27, 2009)**

Before TJOFLAT, BIRCH and DUBINA, Circuit Judges.

PER CURIAM:

Jesus Alfonso Ferrer Marcano ("Ferrer"), on behalf of himself and his wife, Patricia Myriam Urosa Urdaneta ("Urosa"), petitions us for review of a final order by the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his claims for asylum and withholding of removal. The BIA agreed with the IJ's adverse credibility finding and her determination that Marcano failed to provide sufficient additional evidence to show his eligibility for asylum or withholding of removal. Based on our review of the record, we DENY the petition.

## I. BACKGROUND

Ferrer and Urosa, both of whom are natives and citizens of Venezuela, arrived in the United States in July 2005, as non-immigrants with permission to remain until January 2006. Administrative Record ("AR") at 492. On 6 February 2006, the Department of Homeland Security ("DHS") issued both of them Notices to Appear ("NTA"), charging that they were subject to removal under 8 U.S.C. § 1227(a)(1)(B), INA § 237(a)(1)(B), as aliens had who remained in the United States for a time longer than permitted. Id. at 506. At an initial removal hearing in June 2006, Ferrer admitted the allegations contained in the NTA and conceded removability. Id. at 73.

In December 2005, Ferrer applied for asylum and withholding of removal

2

based on political opinion.[1]  Id. at 391, 395, 399.  In his application, he identified

only one past employer, Metro de Maracaibo ("Metro"), where he had claimed to

have worked as an internal auditor from December 2001 to October 2004.  Id. at

394.  In his application, he noted that he had been an active member of COPEI, the

Social Christian Party in Venezuela, since 1995.[2]  Id. at 396, 402.  He also asserted

a fear of being tortured or killed if he returned to Venezuela.  Id. at 395.

Ferrer attached a statement to his application in which he discussed the basis

for his asylum claim.  Id. at 402–06.  He identified himself as a longstanding

opponent of Hugo Chavez, the President of Venezuela.  Id. at 402.  He expressed

this opposition first by joining the COPEI Revolutionary Youth Group and later by

actively participating in marches, campaigns and other collaborative efforts

protesting against Chavez.  Id.  Ferrer described how in late 2004, the Venezuelan

government became the largest shareholder in Metro and instituted a number of

personnel changes, including appointing to positions of authority those

sympathetic to Chavez.  In addition, the Division of Intelligence and Police

Investigation Service (DISIP) began to investigate those who, like Ferrer, had

signed a referendum to revoke Chavez's presidential mandate or were otherwise

---

[1] He also applied for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT").  Id. at 395.  The IJ denied this relief and he did not appeal this decision to either the BIA or us.

[2] He spelled it Copey in the application.

3

believed to be opposed to him. Id. at 402–03.

Ferrer further stated that, shortly after these investigations commenced, he and his superior, Nancy Peña, observed company funds being diverted to political campaigns. Id. at 403. They composed a report discussing these abuses but never published it because Peña was fired before it could be completed. Id. In July 2004, Ferrer claimed to have received threats from various DISIP officers, in response to which he began to participate in meetings with those advising Manuel Rosales, the governor of Zulia, the state in which Maricaibo is located, who opposed Chavez. Id. Later that month, an unknown individual called Urosa and threatened to harm Ferrer if he did not stop opposing Chavez. Id. Despite this warning, Ferrer continued to participate in opposition activities, including campaigning for Rosales. Id. at 404.

Ferrer also noted that, at some point in October 2004, Metro officials asked him to endorse their illegal disbursements or to resign. Id. He declined to do either, so they had DISIP officers bar him from reentering the building. Id. Ferrer unsuccessfully tried to oppose his firing. Id. at 405. Shortly thereafter, he began to receive ominous phone calls and was followed by a white Ford Explorer, in response to which he and his wife moved to the home of a friend. Id. On 16 January 2005, he was caught by three DISIP officers, put into a white Ford Explorer, taken into the woods with a hood over his head, beaten, and left by the

side of the road.  Id.  After this incident, he and his wife moved to Caracas to live with another friend.  Id.  Two months later, that friend began to receive threatening phone calls regarding his harboring of Ferrer.  Id.  After learning of these calls, Ferrer felt he had no choice but to leave the country.  Id. at 406.  He applied for a visa and left for the United States on 15 July 2005.  Id.

Ferrer attached a number of exhibits to his application, including medical and police reports discussing the 16 January 2005 beating and Ferrer's injuries, a document noting his membership in COPEI since 1995, and a statement from Nancy Peña, whose recollection of the events at Metro corresponded to the details in Ferrer's statement.  Id. at 470, 473, 475, 479, 481.  He also provided a copy of the United States Department of State's 2006 Country Report on Human Rights Practices in Venezuela.  Id. at 145.  According to this report, there had been harassment of political opposition during 2006.  Id.  In particular, the report discussed how the government had compiled a list, termed the "Tascon List," of all those who had signed petitions opposing Chavez.  Id. at 150.  The government then harassed or fired those on the list who were also government employees.  Id.

Ferrer also included an affidavit from his mother-in-law, who stated that Ferrer and his wife had been persecuted and threatened physically because of their political opinions and that their lives might be imperiled if forced to return to Venezuela.  Id. at 418–20.  She also noted that she had and the rest of her family

had likewise experienced persecution because of Ferrer's beliefs, most notably when people attempted to murder her son, Andres Fernando Urosa Urdaneta ("Andres"), in June 2006 when he was driving an automobile registered in Ferrer's name.  Id. at 418–19.

Ferrer's other attachments confirmed this incident.  Andres, in an affidavit, asserted that the shooting was really an assassination attempt on Ferrer perpetrated by followers of Chavez.  Id. at 308.  He based this conclusion on three facts:  his close resemblance to Ferrer, his encounters shortly before the incident with various individuals who expressed a belief that Ferrer had returned, and the assailants yelling "You came back" as they shot him.  Id. at 308–09.  Ferrer also included various police and court documents about the shooting, as well as photographs showing the damage to the car.  Id. at 266, 268, 274–78, 299.  These documents confirmed that Andres owned a gray Ford sedan, which Ferrer had previously owned, and that a bullet hit the car while Andres was driving it on 2 June 2006.  Id. at 266, 268, 274.  The police report concluded that the shooting was targeted at Ferrer, not Andres, because of the resemblance of the two, Ferrer's prior ownership of the car, and Andres' claim that, before the shooting, the attackers screamed "You returned . . . we're gonna kill you and your wife . . . Jesus."  Id. at 299.

Ferrer testified at his 26 March 2007 removal hearing.  Id. at 78.  He affirmed that his application was accurate and contained all information important

to his removal claim. Id. at 83. He stated that he had been persecuted by the Bolivarian Circles ("the Circles"), a group of Chavez's followers who persecuted enemies of the revolution, because of his political activity. Id. at 85. This political activity included participating in COPEI, for which he claimed to have been the first vice president for the youth. Id. at 85–86. He indicated that he first drew the ire of the Circles in July 2004 when, as an auditor at Metro, he refused requests to siphon money to various political campaigns associated with Chavez. Id. at 91. The Circles responded to his refusal by informing him that they knew he was a member of COPEI and had supported various attempts to reduce Chavez's power. Id. at 92. He also noted that he had been placed on the Tascon List because of his support for revoking Chavez's referendum. Id. at 93. Around the same time, he and his wife received a number of threatening phone calls which Ferrer believed to be from the Circles and led him to move to the house of a friend. Id. at 92–94.

Ferrer also recounted the 15 January 2005 kidnapping and events thereafter. He stated that he was kidnapped by three individuals in a white Ford Explorer, the same van used by DICIP and the Circles. Id. at 95. These assailants beat him in the face, stomach and legs, leading to a broken nose and bruises on his right leg and left eye. Id. at 95–97. He was subsequently released with the admonition that this was his last warning and that he should "stay away" and "stop bugging their lives" or they would kill him because he was "a squalid." Id. at 96. Because of

this incident, he and his wife went to live with Carlos Alberto Rincon, a friend in Caracas on 20 January 2005. Id. at 97. On 17 February 2005, Rincon received a phone call in which the speaker asserted that he knew Ferrer was living there, that Ferrer was an opponent of the revolution, and that Rincon would be deemed an opponent as well if he let Ferrer stay there. Id. at 98. Based on this threat, Rincon asked Ferrer to leave the house. Id. Ferrer then moved in with a different friend in Caracas before coming to the United States in July 2005. Id. at 98–99.

Ferrer also discussed events since his departure. He asserted that the attempt on Andres was actually against him because the Circles had been asking family members to see Ferrer in the days leading up to the incident and the assailants had stated "You came back . . . Jesus." Id. at 101. He also noted that family members had received threatening phone calls from individuals who had discovered that Ferrer continued to participate in anti-Chavez activities in the United States. Id. at 102–03. Because of these phone calls, family members had urged him not to return to Venezuela, and Ferrer feared losing his life if he returned. Id. at 103.

On cross-examination, Ferrer admitted that the affidavit he submitted from COPEI officials identified him only as a member of the organization, not as a vice president, and that the only proof he had of being vice president came from family members' affidavits. Id. at 104–05, 112. He also acknowledged that he had no proof of his employment with Metro or of the veracity of his description of his

8

time there other than the affidavit from Nancy Peña, though he claimed that he was unable to provide an employment card because it had been taken away from him when he was fired. Id. at 105–06. He noted that he was able to get police reports about the incidents involving himself and Andres because the police were part of the government of Zulia, which is in opposition to Chavez. Id. at 106–07. Ferrer also confirmed that Andres' initial statement about the shooting did not mention the assailants referring to Ferrer. Id. at 112.

After the completion of the cross-examination, the IJ questioned Ferrer. In response to her questions, Ferrer stated that he worked at the state bidding commission in Zulia from October 2004 to January 2006. Id. at 122, 125–26. The bidding commission, whose members were selected and trusted by Governor Rosales, analyzed public works projects. Id. at 122, 125–28. Ferrer had no proof of this employment because of the hurried manner in which he had to leave Maracaibo after the kidnapping. Id. at 129. Ferrer explained that he did not mention this employment on his asylum application because he thought that he needed to discuss only that employment relevant to the events upon which he based his persecution claim. Id.

The IJ also asked Ferrer about the causes for the various incidents he recounted. Ferrer claimed that he received the July 2004 and November 2004 threatening phone calls because of his refusal to misappropriate Metro funds. Id. at

9

130. He stated that he was kidnapped and beaten because Governor Rosales had asked him to be part of a public announcement reporting on the problems at Metro. Id. at 131–34. Chavez's supporters were aware of his plan to participate because they had intercepted his phone calls. Id. at 132–34. Ferrer said that he did not mention any of this in his application because the application preparer requested concrete facts and did not request an extended version of his story. Id. at 135.

The IJ issued an oral decision denying his applications for asylum, withholding of removal, or CAT relief.[3] Id. at 68. She found Ferrer not to be credible based on a number of inconsistencies between his testimony and his application. Id. at 57–61. She particularly focused on inconsistencies regarding Ferrer's employment with the bidding commission and the rationale for his kidnapping. Id. at 57–59. His application did not mention this employment at all, whereas he testified that the kidnappers targeted him because of his activities in connection with Rosales and the bidding commission. Id. at 58–60. The IJ also found inconsistencies regarding his role in COPEI, namely whether he was a vice president of COPEI's youth group or merely a member. Id. at 60–61.

In addition to making an adverse credibility finding, the IJ determined that Ferrer had not provided sufficient evidence to show past persecution or a well-

---

[3] In the course of the IJ's opinion, she made a number of factual errors. In particular, she misstated several dates for events, such as Ferrer's period of employment with the bidding commission, when he was kidnapped, and when he fled to the United States. Id. at 50–53.

founded fear of future persecution based on political opinion. Id. at 61. She thought that Ferrer based his application on his employment with Metro and with the bidding commission and found there to have been no objective evidence of either in the record. Id. at 61–62. She also found no objective evidence of his being a vice president in COPEI. Id. at 62–63. As to the alleged assassination attempt, she focused on Andres' contradictory statements about what was said at the time of the shooting and concluded that there was no objective evidence that Ferrer was the target. Id. at 63–64. The IJ also determined that Ferrer's statements about the threats against him lacked the detail necessary to determine why he had been targeted, and that it was unlikely that Ferrer was a serious opponent of the Chavez government because such a person would have been dealt with swiftly rather than with vague threats. Id. at 65.

Ferrer appealed the IJ's decision regarding his applications for asylum and withholding of removal to the BIA. Id. at 38–40. He argued that the IJ erred in making the adverse credibility finding since there were no material discrepancies in the record and that he had met his burden of proof of establishing past persecution. Id. at 13–14. He also asserted that the misstated dates and other factual errors in the IJ's decision showed that the IJ misunderstood his testimony. Id. at 16–17. The BIA found no reversible error and therefore dismissed Ferrer's appeal. Id. at 2–3. It concluded that the IJ's adverse credibility finding was

11

justified since she had considered the discrepancies in Ferrer's application in light of the overall circumstances. Id. at 2. It also noted that any misstatements by the IJ did not affect the adverse credibility finding. Id. at 2–3. Additionally, the BIA concluded that the IJ's explanation for finding the available evidence inadequate was reasonable and that Ferrer had not given an adequate rationale for overturning the IJ's decision. Id. at 3. Ferrer now petitions us to review the BIA's decision.

## II. DISCUSSION

Ferrer raises two issues in his petition for review. First, he contends that the BIA erred in affirming the IJ's adverse credibility finding. Second, he asserts that the BIA erred in finding that he had not established persecution on account of his political opinion. We address these arguments in turn.

A. Adverse Credibility

Ferrer asserts that the reasons the IJ cited for making her adverse credibility determination were not based on actual discrepancies and omissions in the record and that she failed to provide specific reasons to support her finding. He also argues that he provided an adequate explanation for all of the alleged omissions and discrepancies.

Because the BIA affirmed the IJ's decision but did not expressly adopt it, we review only the BIA's decision. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). When considering a petition to review a final order, we review

12

legal issues de novo. See Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). We review factual findings, including credibility determinations, under the substantial evidence test. See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). "Under this highly deferential test, we affirm the [BIA's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (quotation marks and citation omitted). To reverse the BIA's factual findings, "we must find not only that the evidence supports a contrary conclusion, but that it compels one." Farquharson v. U.S. Att'y Gen., 246 F.3d 1317, 1320 (11th Cir. 2001); see also Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) ("[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.")

Adverse credibility is assessed in light of the totality of the circumstances and may be based on inaccuracies or falsehoods that do not "go[] to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). An applicant's testimony, if credible, may be sufficient to sustain the burden of proof for asylum without independent corroboration. 8 C.F.R. § 208.13(a). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue, 401 F.3d at 1287. The BIA must provide "specific, cogent reasons" for its adverse credibility finding. Id. We "may not substitute [our]

13

judgment for that of the [BIA] with respect to credibility findings." Id. at 1286 (quotation marks and citation omitted).

Once the BIA makes an adverse credibility determination, it still has the duty to consider the applicant's other evidence supporting his persecution in "whatever form it may take." Id. However, the burden is on the applicant to show that the finding "was not supported by specific, cogent reasons or was not based on substantial evidence." Id. (quotation marks and citation omitted). To meet this burden, the applicant must do more than argue that the BIA's decision relied upon "inconsistencies and discrepancies [that were] trivial and irrelevant to the dispositive issues." Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1232–33 (11th Cir. 2006) (per curiam) (quotation marks omitted). Providing a "tenable" explanation for these discrepancies would not compel us to find that the BIA's credibility determination was not supported by substantial evidence, particularly if the applicant provides little or no corroborating evidence. Id. at 1233.

We find that substantial evidence supports the BIA's adverse credibility determination. As Ferrer admits, he omitted from his application any mention of his role on the bidding commission and the related events involving Rosales and the government corruption report. He asserts that the omission of the four-month employment was not material and was insufficient to support an adverse credibility finding. However, his argument ignores the fact that an evidentiary discrepancy

14

need not be relevant to a dispositive issue. See id. We also note that his testimony suggested that these events were an impetus behind his kidnapping, which makes them quite pertinent to his claim. Additionally, although the IJ misstated the time period that Ferrer was employed with the bidding commission, the BIA found this error not to be material and relied on other grounds to support its upholding of the adverse credibility determination. Ferrer has offered other explanations for these discrepancies, most notably that he did not elaborate about his employment because the person preparing his asylum application requested concrete facts. Though there might be some support in the record for these assertions, it is not sufficient to compel us to come to a contrary conclusion than that of the BIA. See Farquharson, 246 F.3d at 1320.

B. Other Evidence Supporting Persecution

Ferrer argues that he showed past persecution and a well-founded fear of future persecution on account of his political opinion. In support of his past persecution claim, he points to his kidnapping and beating, which he contends occurred because he opposed Chavez's government. He asserts that his claim is further buttressed by the threatening phone calls he received from members of the Circles prior to the kidnapping, which the IJ and BIA incorrectly disregarded. He also criticizes the IJ for deeming his explanation for the kidnapping implausible based on her unsubstantiated belief that the Venezuelan government would have

15

acted differently if it truly was responding to his political opposition. Ferrer also contends that he established a well-founded fear of future persecution based on the attempted assassination attempt in June 2006. He asserts that the IJ and BIA erred in finding that there was a lack of objective evidence to support his explanation for the incident.

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1) (2008). To be entitled to asylum, the alien has the burden of proving with "credible, direct, and specific evidence in the record" that he is a refugee. Forgue, 401 F.3d at 1287. A "refugee" is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). An alien thus could prove his eligibility for asylum by showing either that he experienced past persecution on account of one of his political opinion or that he has a "well-founded fear" that he will be subject to future persecution because of that opinion. 8 C.F.R. § 208.13(b). If he proves past persecution on account of a protected ground, there is a rebuttable presumption that

16

he has a well-founded fear of future persecution.  See id.  Failure to establish a claim of asylum on the merits necessarily causes a claim for withholding of removal to fail.  Forgue, 401 F.3d at 1288 n.4.

Persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation."  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (quotation marks and citation omitted).  Attempted murder would constitute persecution, as would repeated threats and physical attacks over a period of several months.  See Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1257–58 (11th Cir. 2007); Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1233 (11th Cir. 2007).  Additionally, "[w]e may consider a threatening act against another as evidence that the petitioner suffered persecution where that act concomitantly threatens the petitioner."  De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1009 n.7 (11th Cir. 2008).  However, "evidence that either is consistent with acts of private violence or the petitioner's failure to cooperate with guerillas, or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground."  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006) (per curiam).

An alien can establish a well-founded fear of future persecution based on a political opinion by "present[ing] specific, detailed facts showing a good reason to

17

fear that he will be singled out for persecution on account of such an opinion." Id. (quotation marks and citation omitted). His fear of persecution must be both subjectively genuine and objectively reasonable. See id. at 1257. The subjective component can be proven "by the applicant's credible testimony that he or she genuinely fears persecution, . . . . [and] the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Al Najjar, 257 F.3d at 1289 (quotation marks and citation omitted).

Ferrer has provided evidence that he experienced past persecution, but he has not shown that it was because of his political opinion. His kidnapping and beating by DISIP officers, which was verified by police and medical reports, established past persecution. See Mejia, 498 F.3d at 1257–58. However, the record contains conflicting evidence regarding the cause of this incident. The police report containing Ferrer's description of the kidnapping indicates that Ferrer's attackers told him to "stop screwing around." AR at 470. Similarly, his asylum application stated that the kidnappers threatened to kill him if he continued opposing the government. Id. at 405. At the removal hearing, however, Ferrer testified that he was beaten because of his position on the bidding commission and his plans to help in the announcement of the irregularities at Metro. Id. at 131–33. This latter explanation would not constitute persecution on account of a political opinion. See Ruiz, 440 F.3d at 1258. Since the motivation for the attack was

18

unclear, the record does not compel us to reach a conclusion contrary to the BIA's opinion that the persecution was not because of Ferrer's political opinion. See Adefemi, 386 F.3d at 1027; Farquharson, 246 F.3d at 1320.

Similarly, Ferrer has not established that he is entitled to a presumption that he has a well-founded fear of future persecution. There is evidence to support such a fear since the shooting involving Andres appears to have been attempted murder and can be viewed as a threat against Ferrer. See De Santamaria, 525 F.3d at 1009 n.7; Sanchez Jimenez, 492 F.3d at 1233. There was no evidence in the record, however, that the shooting was on account of Ferrer's political opinion. See Ruiz, 440 F.3d at 1258. Accordingly, the record does not compel us to find that Ferrer had a well-founded fear of future persecution based on a statutorily-protected ground. Given this conclusion, we also find that the record does not compel the conclusion that he meets the more stringent standard for withholding of removal. See Forgue, 401 F.3d at 1288 n.4.

## III. CONCLUSION

Ferrer seeks review of the BIA's denial of his application for asylum or withholding of removal. The record does not contain sufficient evidence to compel us to reverse the BIA's determinations that Ferrer was not credible and had not met his burden of proof to establish eligibility for asylum or withholding of removal. We thus DENY his petition for review.

**PETITION DENIED**.

19