[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11985

_____

BIA Nos. A79-513-473 & A79-513-504

JHONYER FRANCISCO MARIN MEJIA,
MARIA EUGENIA MARTINEZ CAMARGO,

                                                Petitioners,

                        versus

U.S. ATTORNEY GENERAL,

                                                Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 6, 2007)**

Before BARKETT and KRAVITCH, Circuit Judges, and TRAGER,* District
Judge.

_____

    * Honorable David G. Trager, United States District Judge for the Eastern District of
New York, sitting by designation.

BARKETT, Circuit Judge:

Jhonyer Francisco Marin Mejia ("Mejia") and his wife, Maria Eugenia Martinez Camargo ("Camargo"), through counsel, seek review of the Board of Immigration Appeal's ("BIA") decision affirming the Immigration Judge's ("IJ") order denying their application for asylum and withholding of removal under the Immigration and Nationality Act ("INA").[1] On appeal, the petitioners argue that the BIA erred by finding that they (1) failed to demonstrate past persecution or a well-founded fear of future persecution; and (2) failed to demonstrate that any persecution they suffered was on account of a protected ground. They claim to have demonstrated past persecution by the Revolutionary Armed Forces of Colombia ("FARC") on account of Mejia's support for the Liberal Party.

## BACKGROUND

Mejia joined the Liberal Party in 1995, and soon became active in a variety of Party activities.[2] He assisted a Party-sponsored literacy campaign in 1997, supported the Party's 1998 presidential campaign, attended "peace walks," and prepared political pamphlets. Mejia was especially active as a member of

---

[1] Although the IJ also denied their request for relief under the Convention Against Torture ("CAT"), the petitioners do not challenge that denial on appeal. We therefore deem it to be abandoned. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1283 n.12 (11th Cir. 2001).

[2] Because the IJ made no adverse credibility finding, we take Mejia's testimony as true.

"Commune 20," a Party-associated youth group in the petitioners' hometown of Cali. With Commune 20, Mejia organized youth soccer and basketball games, and also encouraged young people to participate in programs that provided sex education and attempted to implement policies against the use of drugs and weapons. Mejia stated that these were among the ideals of the Liberal Party. Commune 20 met weekly, and put on larger events approximately twice per year.

Mejia testified that his activities caught the attention of the FARC—the most powerful guerrilla group in Colombia[3]—which opposed the Liberal Party. Mejia further contends that the FARC persecuted him on account of his support and participation in Party activities, beginning in 1999 and continuing through February 2001. The first incident occurred on October 15, 1999, when Mejia found graffiti at his wife's farm which alluded to the FARC's presence in the area, and referenced him specifically. Thinking that the graffiti was the work of FARC

---

[3] The FARC emerged in the 1960s as the radicalized leftist by-product of a ten-year de facto civil war between Liberals and Conservatives in Colombia known as La Violencia. Jose E. Arvelo, Note, International Law and Conflict Resolution in Colombia: Balancing Peace and Justice in the Paramilitary Demobilization Process, 37 Geo. J. Int'l L. 411, 415-17 (2006). The FARC claims to "represent the rural poor against Colombia's wealthy classes and oppose American influence in Colombia (particularly Plan Colombia), the privatization of natural resources, multinational corporations and rightest violence." Council on Foreign Relations, FARC, ELN, AUC (Colombia, rebels) (Nov. 2005), http://www.cfr.org/publication/9272/farc_eln_auc_colombia_rebels.html?breadcrumb=%2Fregion%2F246%2Fcolombia. In order to advance this political philosophy, the FARC has struggled to seize power from, and in some areas effectively replace, the Colombian government. William D. Shingleton, Understanding Colombia, 25 Fletcher F. World Aff. 255, 260 (2001).

guerrillas who were simply passing through the area, Mejia and Camargo did not report the incident to the police. Then, on October 7, 2000, during a youth soccer game associated with the Liberal Party, two unidentified individuals threw a large rock at Mejia and then quickly fled the scene. When Mejia returned home, Camargo informed him that she had received a threatening phone call from the FARC instructing Mejia to stop all contact with the community and to suspend his political activities.

The attacks escalated. On November 27, 2000, three armed men identifying themselves as members of the FARC stopped Mejia and Camargo's car on a roadway outside of Cali. One of the men came to Camargo's side of the vehicle, while another approached on Mejia's side. The men forced Mejia to exit the vehicle. One of them put a gun to Mejia's head, told him that he knew where Mejia and his family lived, accused him of being a traitor, and asked him whether "the call was enough." The men told Mejia that he should go far away, and that he was to stop "doing what [he] was involved in" and "had to stop all contact that [he] was having with the community." They then threw Mejia down and hit him in the face with the butt of a rifle, breaking his nose. As he lay on the ground, the men hurled insults at him before departing. Mejia went to the hospital for surgery on his nose. He reported the incident to the police on November 29, 2000.

Finally, on February 3, 2001, Mejia received a "condolence" letter which specifically named him and referenced his "sure death." Mejia also reported this incident to the police, who told him that they could not offer him security. He then made plans to travel to the United States.[4] After he left, his mother continued to receive threatening phone calls saying that the FARC was looking for Mejia and that it would find him.

On or about March 15, 2001, Mejia and Camargo were admitted to the United States as nonimmigrant visitors for business, with authorization to remain until September 14, 2001. On January 22, 2002, Mejia filed an application for asylum on behalf of his wife and himself, withholding of removal, and relief under the CAT. In February 2002, the Immigration and Naturalization Service ("INS") served the petitioners with notices to appear, charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States for a time longer than permitted.

Following a hearing on Mejia's claims, the IJ found that "for the most part" Mejia's testimony was consistent with his application, and made no adverse credibility finding. The IJ concluded, however, that Mejia's "limited political and community activism" did not amount to past persecution or a reasonable fear of

---

[4] Mejia had apparently planned to travel to the United States in December 2000, but delayed his trip due to "some difficulties."

future persecution, and denied Mejia's application for asylum and withholding of removal. On appeal, the BIA affirmed in a separate opinion.

We "review[] only the decision of the BIA, except to the extent that it expressly adopts the IJ's opinion." Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1368 (11th Cir. 2005) (internal quotations and citation omitted). To the extent that the BIA or IJ's decision was based on a legal determination, we review de novo. Id. We review the IJ and BIA's factual determinations under the substantial evidence test, and we will "affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (alteration in original) (internal quotations and citations omitted).

**DISCUSSION**

An alien who arrives in, or is present in, the United States may apply for asylum. INA § 209 (a)(1), 8 U.S.C. § 1158(a)(1). Under the INA, the Attorney General or Secretary of Homeland Security may grant asylum if the alien meets the statutory definition of "refugee." See 8 U.S.C. § 1158(b)(1)(A). The definition of refugee includes:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on

> account of race, religion, nationality, membership in a particular social group, or political opinion.

Id. § 1101(a)(42)(A). The asylum applicant has the burden of proving the "refugee" status that entitles him or her to be considered for asylum. Al Najjar, 257 F.3d at 1284; 8 C.F.R. § 208.13(a). In order to carry this burden, the applicant must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground. 8 C.F.R. § 208.13(b); Al Najjar, 257 F.3d at 1287.

To establish a well-founded fear of persecution, the applicant need only show that "[t]here is a reasonable possibility of suffering such persecution if he or she were to return to that country." 8 C.F.R. § 208.13(b)(2)(i)(B) (emphasis added); see also INS v. Cardoza-Fonseca, 480 U.S. 421, 450 (1987) ("Congress did not intend to restrict eligibility for [asylum] to those who could prove that it is more likely than not that they will be persecuted if deported."). An applicant who has demonstrated past persecution is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). That presumption can be rebutted if the IJ finds that there has been a "fundamental change in circumstances" such that the fear is no longer well-founded, or that the applicant can safely relocate within

the country of nationality. Id.[5] Although the INA itself does not define "persecution," we have recognized that proving persecution requires "more than a few isolated incidents of verbal harassment or intimidation . . . ." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) (citation omitted).

We begin by noting that, as the government conceded at oral argument, the IJ in this case made no adverse credibility finding. We require IJs to make "clean determinations of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal citation omitted); see also id. ("Though the IJ made a reference to Yang's claims as a 'ridiculous fabrication' and stated that her testimony was 'extremely inconsistent and [made] absolutely no sense whatsoever,' we are not persuaded that this was an explicit finding that Yang's testimony was not credible."). As we noted in Forgue, IJs must also provide "specific, cogent reasons for an adverse credibility finding." 401 F.3d at1287. The IJ did not do so here, and thus we accept Mejia's testimony as credible.[6]

The question before us, then, is whether, as a matter of law, what Mejia endured constitutes past persecution, and we find that it does. Mejia received

---

[5] Because the BIA in this case found that Mejia had not shown persecution or a well-founded fear of persecution, it did not reach "the issue of whether the respondent could safely reside elsewhere in Colombia."

[6] We note also that Mejia corroborated his testimony by submitting police reports and a hospital report, although neither document was authenticated.

threats and attempted attacks over an 18 month period, which culminated when he and Camargo were stopped on a roadway by three armed members of the FARC, who threatened Mejia at gunpoint, threw him to the ground, and smashed him in the face with the butt of a rifle, breaking his nose. Prior to that, a large rock was thrown at him during a Liberal Party-sponsored soccer game, and Camargo received a threatening telephone call from the FARC immediately after the attack at the soccer game.[7] These direct attacks were accompanied by threats, including FARC graffiti at Camargo's farm which specifically named Mejia, a subsequent condolence letter that referenced his sure death, and threatening phone calls his mother received after he left Colombia.

While a "few isolated incidents of verbal harassment or intimidation" do not demonstrate past persecution, Gonzalez, 212 F.3d at 1355 (citation omitted), the threats and attacks the petitioners suffered were neither "isolated" nor simply "harassment." Mejia was physically attacked twice: once when a large rock was thrown at him and once when members of the FARC pointed a gun at his head and then broke his nose with the butt of a rifle. Given these physical assaults, the

---

[7] Our recent decision in Jimenez v. U.S. Att'y Gen. makes clear that an attack can be "physical" and constitute a form of persecution even if the intended target of the attack is not actually struck by the attacker's projectile. Jimenez,492 F.3d 1223, 1233-34 (11th Cir. 2007) (holding that petitioner "suffered past persecution when two FARC members on motorcycles followed him and intentionally shot at him in his moving car" even though the shooters missed; and that the IJ erred by focusing on whether petitioner was "physically harmed").

verbal threats Mejia and his wife received cannot be considered "isolated." In assessing past persecution we are required to consider the <u>cumulative</u> impact of the mistreatment the petitioners suffered. <u>Ruiz v. Gonzales</u>, __ F.3d __, 2007 U.S. App. LEXIS 3699, at *11 (11th Cir. Feb. 20, 2007). Considering the cumulative effects of the escalating threats and attacks, we conclude that Mejia suffered past persecution. Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861-62 (11th Cir. 2007).

The IJ in this case made no finding regarding the second prong of the persecution question—whether the mistreatment Mejia suffered was "on account of" his political opinion. Because neither the IJ nor the BIA reached this issue, we remand for a determination in the first instance. See Lopez v. U.S. Att'y Gen., 490 F.3d 1312, 1316 (11th Cir. 2007).

Accordingly, the BIA's decision is **VACATED** and **REMANDED** for further proceedings consistent herewith.