[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15213

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 7, 2009
THOMAS K. KAHN
CLERK

BIA No. A97-928-921

EDUARDO JOSE LUBO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 7, 2009)**

Before HULL, MARCUS  and KRAVITCH, Circuit Judges.

PER CURIAM:

Eduardo Jose Lubo appeals from the Board of Immigration Appeals's ("BIA")

affirmance of the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal. After thorough review, we conclude that the record does not compel a finding that Lubo suffered past persecution or has a well-founded fear of future persecution.[1] Accordingly, we deny Lubo's petition in its entirety.

I.

Lubo, a native and citizen of Venezuela, arrived in the United States in 2003. He is a professional engineer. On July 9, 2004, the Department of Homeland Security issued a Notice to Appear, charging that Lubo was removable. Lubo filed an application for asylum, withholding of removal, and Convention Against Torture relief, on the ground that he had been, and would be persecuted on account of his political opinion.

In his filings and during testimony at his hearing before the IJ, Lubo claimed the following. Both Lubo and his father were active in the Democratic Action Party, which opposes Hugo Chavez and his "Bolivarian Circles" group (a "brigade" of people that Chavez's government pays to intimidate opponents). Lubo would help organize rallies and marches and, most importantly, would speak against Chavez in

_____

[1] Although petitioner made passing reference to a claim arising under Article 3 of the Convention Against Torture, he has offered no argument on the issue and has, therefore, waived any challenge to this claim. See Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned").

public and at the state-run civil construction company where Lubo worked.

The alleged persecution began with threatening telephone calls in 1998 that continued until Lubo left Venezuela in 2003. The frequency of these phone calls varied with the schedule of political events, but at times Lubo received daily threats of severe bodily injury or death. Lubo's father also received such telephone calls. As a result of the threats, Lubo changed his mobile telephone number, but his new number was discovered and the threats resumed. Lubo speculated at his hearing that at least some of the threats were coming from members of the Bolivarian Circles who worked for his employer because he had provided his changed mobile telephone number only to his employer.

In addition, Lubo was subjected to physical violence on two occasions. On July 7, 2002, Lubo was at work and supervising his subordinates who were working on pipes beneath the street. Three men approached him; one was armed with a knife. That armed attacker asked Lubo why he was "speaking bad about the government." Lubo replied that it was "his right" and the man threw the knife to the ground and began punching Lubo. Lubo's co-workers then pulled the attacker off of him and the three men fled. Lubo testified that he received some bruises and his grandmother, who is a nurse, took care of him. He did not require hospitalization. Lubo submitted a police report filed after the beating.

In response to this attack, Lubo moved from his apartment to a home five miles away in a guarded, gated community. During a nationwide strike against the government on December 9, 2002, three men "wearing hoods" and carrying a gun "of high caliber" broke into Lubo's home, bound and gagged Lubo and his wife, and beat them both. In particular, the attackers kicked and hit Lubo, leaving him with "mostly bruises" and a "red thing" on his face. Before fleeing, the attackers disconnected Lubo's telephone line, stole the battery from his mobile telephone, and went through his documents. They also left Lubo and his wife bound and gagged on the floor when they exited. Lubo and his wife were freed approximately an hour later when Lubo's father arrived at the home to celebrate Lubo's birthday, which was coincidentally that day. Lubo submitted a police report filed after the attack.

After approximately two months, Lubo left Venezuela for the United States. His wife did not accompany him and they are now divorced. Lubo's sixty-five year old father remains in Venezuela and continues to oppose Chavez. At one point, he even ran for mayor. Members of the Bolivarian Circles continue to threaten Lubo's father for his opposition activity and he was allegedly beaten in 2005. Lubo's father has told Lubo not to return to Venezuela.

Lubo was admitted to the United States on February 15, 2003 with a non-immigrant visa. On July 9, 2004, the Department of Homeland Security issued a

Notice to Appear, charging that Lubo was removable because he violated the conditions of his non-immigrant visa. Lubo filed an application for asylum, withholding of removal, and Convention Against Torture relief on the ground that he had been, and would be, persecuted as a result of his political opinions in Venezuela.

Following the hearing, the IJ denied asylum, withholding of removal, and Convention Against Torture relief. The IJ stated that, while Lubo's testimony was credible, for the most part, he failed to present sufficient evidence to establish either past persecution or a well-founded fear of future persecution. Specifically, the IJ based her decision on the fact that while there were many threats, there were only two that culminated in physical altercations and neither one of them resulted in serious injuries or involved the use of weapons. The IJ also found that the petitioner's well-founded fear claim was undermined by the fact that his father remained in Venezuela without incident, even though he remained active in Democratic Party activities. Finally, the IJ concluded that since the petitioner had failed to establish the lower burden of proof required for asylum, the petitioner did not establish that it was more likely than not that he would be persecuted and had failed to meet his burden of establishing eligibility for withholding of removal and Convention Against Torture protection.

Upon appeal of the IJ's decision, the BIA affirmed. It found that Lubo had not

established that he had been the victim of past persecution. The BIA agreed with the IJ's classification of the first beating as an "office scuffle between coworkers," noted that Lubo suffered only bruises, and thought it was important that one of Lubo's subordinates was able to pull the attacker off of Lubo. Moreover, the BIA did not think the second beating amounted to the level of past persecution because Lubo only had some bruises and a "red thing" on his face. The BIA also found that Lubo did not have a well-founded fear of persecution. Lastly, the BIA reasoned that because Lubo could not satisfy his burden for asylum, he also failed to satisfy his higher burden for withholding of removal and CAT relief.

Lubo now petitions this Court for review. His briefs argued only that the BIA erred in denying his petition for asylum and withholding of removal.

II.

We "review[] only the decision of the BIA, except to the extent that it expressly adopts the IJ's opinion." Meija v. United States Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (internal citations omitted). We review legal determinations de novo. Id. Factual determinations are reviewed under the highly deferential substantial evidence standard, meaning that we must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. The record must be viewed in the light most favorable

to the BIA's decision and we must draw all reasonable inferences in favor of that decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001). Accordingly, we can reverse the BIA's factual findings only if we find that the record compels us to do so. Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

*A.    Asylum*

To be eligible for asylum, a petitioner must prove that he is a "refugee" within the meaning of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1)(A); see generally Sanchez Jiminez v. United States Att'y Gen., 492 F.3d 1223, 1231-32 (11th Cir. 2007). A "refugee" is defined, in relevant part, as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A).

To establish asylum eligibility, the petitioner bears the burden of proof of demonstrating with "credible, direct, and specific evidence in the record" that: (1) he suffered past persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion"; or (2) he has a "well-founded fear" that

one of these listed factors will cause future persecution. Forgue v. United States Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)); 8 C.F.R. § 208.13(b). Lubo challenges the BIA's determination that he was unable to demonstrate either.

### 1. Past Persecution

To establish asylum based on past persecution, the petitioner must prove (1) that he was persecuted, and, (2) that the persecution was on account of a protected ground. 8 C.F.R. § 208.13(b)(1); Sanchez Jiminez, 492 F.3d at 1232. "[I]t is by now well-established in our case law that an applicant can establish eligibility for asylum as long as he can show that the persecution is, 'at least in part, motivated by a protected ground.'" Sanchez Jiminez, 492 F.3d at 1232 (internal citations omitted).

This Court has never explicitly defined the term "persecution" nor is it defined in the INA or the applicable federal regulations. However, this Court has established a high standard for determining when persecution occurs, stating that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (internal quotation marks and alteration omitted); see also Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) ("Not all exceptional treatment is persecution."). In determining whether a petitioner has been

8

subjected to past persecution, we must look to the cumulative effect of all of the alleged persecutory incidents. Ruiz v. Gonzalez, 479 F.3d 762, 764-66 (11th Cir. 2007). Although there is no rigid requirement of physical injury for a finding of persecution, Sanchez Jiminez, 492 F.3d at 1233, the BIA may still consider the degree of severity of the physical harm that is suffered by a petitioner in determining whether such incidence of violence establishes, or helps to establish, past persecution, Djonda v. United States Att'y Gen., 514 F.3d 1168, 1174 (11th Cir. 2008).

Utilizing these standards, we recently concluded that a petitioner did not suffer past persecution when he was subjected to a single "minor beating" resulting in only "scratches and bruises," a thirty-six hour detention, and a threat of arrest. Id. Additionally, we have found that past persecution did not occur where the petitioner received a written death threat and threatening telephone calls during a one month period, Silva v. United States Att'y Gen., 448 F.3d 1229, 1237 (11th Cir. 2006), or where the petitioner was placed under surveillance, subjected to limited employment opportunities, had his home occasionally searched, and was detained for five days but was not harmed, Zheng v. United States Att'y Gen., 451 F.3d 1287, 1290-91 (11th Cir. 2006).

The cases where this Circuit has found past persecution are extreme. Thus, for example, we found past persecution where the petitioner, as a result of her political

9

activities, received numerous death threats; was assaulted, dragged out of her car by her hair, and struck; was traumatized by the torture and murder of her family groundskeeper who refused to reveal her location; and was kidnaped and beaten with guns after witnessing the murder of another person. De Santamaria v. United States Att'y Gen., 525 F.3d 999, 1009 (11th Cir. 2008). Similarly, we found past persecution where, due to their political activity, the petitioners received threatening telephone calls; had unloaded guns pointed and fired at them by masked men who told them they would be killed if they continued their political speech; had their car vandalized, including having the tires slashed and the brakes cut; and one of the petitioners, who was the son of the other, was beaten until he was nearly unconscious. Delgado v. United States Att'y Gen., 487 F.3d 855, 861 (11th Cir. 2007). We also found past persecution in a case involving "threats and attempted attacks over an 18 month period, which culminated when [the petitioner was] stopped on a roadway by three armed members of the FARC, who threatened [him] at gunpoint, threw him to the ground, and smashed him in the face with the butt of a rifle, breaking his nose." Meija, 498 F.3d at 1257-58.

Lubo was subjected to the following conduct as a result of his political activity. First, he received threatening telephone calls intermittently, dependent on his level of political involvement, from 1998 through March 2002, when such telephone calls

10

occurred almost daily. These telephone calls continued after Lubo changed his mobile telephone number. Second, while supervising his subordinates at a job site, three men, one of whom was armed with a knife, approached Lubo while he was at work, inquired about his political activities, and began punching him. Lubo's co-workers were able to end the altercation, during which Lubo suffered only bruises. Finally, three "hooded" men, one of whom carried a gun of "high caliber," broke into Lubo's home, bound both Lubo and his wife at their hands and feet, placed silver adhesive tape over their mouths, locked them in a room while they searched the home for documents, kicked Lubo and hit him with their hands, told Lubo that his political opinions required that he be "taken out of circulation" and "out of the way." They also cut the telephone line to the home, stole the battery from Lubo's mobile telephone, and left Lubo and his wife bound when they fled the scene. As a result of this incident, Lubo suffered bruises and a "red thing" on his face; he did not seek medical attention. He did not specify any injuries in the police report he filed in his asylum application.

This record does not compel the conclusion that Lubo suffered past persecution. While the harassment and attacks Lubo endured were odious, they simply do not rise to the level of those that occurred in De Santamaria, Delgado, and Meija. His injuries were minor ("mostly bruises"); he was not struck with a weapon;

11

he was not kidnaped; he was not the subject of any other known attempted attacks; and no one close to him was the subject of a serious beating, much less murder, as a result of his political activities. Indeed, Lubo's experience -- which involved threatening telephone calls, minor bruises, and a brief "detention" in his home -- is more akin to that in Djonda, where we determined that physical violence resulting in only scratches and bruises, a thirty-six hour detention, and a threat of arrest did not constitute past persecution. 514 F.3d at 1174.

2. *Future Persecution*

Because Lubo did not demonstrate he suffered past persecution, he is not entitled to the rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); Sanchez Jiminez, 492 F.3d at 1232. Instead, Lubo must demonstrate a causal connection between his political opinion and his feared persecution by " present[ing] specific, detailed facts showing a good reason to fear that he . . . will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287 (internal quotation marks and citations omitted). This requires that he demonstrate that his fear of future persecution is "subjectively genuine and objectively reasonable," id. at 1289, and that "the persecution cannot be avoided by relocating within the subject country," Sepulveda, 401 F.3d at 1231.

Again, the record does not compel a finding that Lubo has a well-founded fear

12

of future persecution. He did not provide specific, detailed facts showing that he had good reason to fear that members of the Bolivarian Circles would pursue and attack him if he returned to Venezuela after a five year absence. Although Lubo argued that the Bolivarian Circles maintained a list with the names of approximately 3.5 million opponents of Chavez on the Internet, Lubo did not demonstrate that assailants targeted people on the list or that they would have a reason to target him specifically. Also, the fact that Lubo's father remains politically active in Venezuela and has been physically harmed only once in 2005 during an attack that Lubo could not establish was related to political activity, and the fact that Lubo's sister lives in Venezuela without incident suggest that Lubo's fear of future persecution is not reasonable. See Ruiz v. United States Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006) (holding that record did not compel finding of asylum on grounds of a future fear of persecution, in part, because the petitioner's child and parents remained in Columbia unharmed).

B.      *Withholding of Removal*

Since we are constrained to conclude that Lubo has failed to meet the lower burden of proof required for asylum, we also find that he has failed to satisfy the clear probability standard required to establish eligibility for withholding of removal. INS v. Stevic, 467 U.S. 407, 429-30 (1984); Djonda, 514 F.3d at 1177.

13

Accordingly, Lubo's petition for review is DENIED.


**DENIED.**