[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 13, 2009
THOMAS K. KAHN
CLERK

No. 08-16997
Non-Argument Calendar

_____

Agency No. A097-956-234

JEAN SAINT-JOUR,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 13, 2009)

Before TJOFLAT, EDMONDSON and BIRCH, Circuit Judges.

PER CURIAM:

Jean-Marie Saint-Jour, a native and citizen of Haiti, seeks review of the decision of the Board of Immigration Appeals ("BIA") affirming the immigration judge's ("IJ's") order of removal and denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c). After reviewing the record, we DENY his petition.

## I. BACKGROUND

Saint-Jour is a native and citizen of Haiti who entered the United States in 2005. See Administrative Record ("AR") at 250. On 28 April 2005, he was issued a notice to appear by the Department of Homeland Security ("DHS"), charging him with removability as an alien not in possession of a valid entry document and/or a valid travel document, pursuant to INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I). Id.

In 2007, Saint-Jour filed an application for asylum, withholding of removal, and CAT relief based on his political opinion and membership in a particular social group. Id. at 189, 193. In his application, he identified himself as a musician and poet who had written songs and poems criticizing the Lavalas government. Id. at 193. Saint-Jour noted that he published a book of poetry in 2003 containing some

poems critical of Lavalas and that the book sold about 750 copies.[1]  Id.  He claimed

that because of his criticism of the Lavalas government, his uncle, Max Box, a

member of the Lavalas party, wanted to kill him.  Id.

Saint-Jour also stated that, in 2004, he entered and won a songwriting

competition with a song accusing the Lavalas government of misleading and doing

nothing for the people of Haiti.  Id.  On 3 March 2004, while Saint-Jour was

speaking on the radio about his song, Box called in, saying that he had warned the

Lavalas party about Saint-Jour and calling on the party and its supporters to

destroy Saint-Jour.  Id.

Saint-Jour further noted in his application that, while in college, he was a

member of a student organization called Solidarity Between Philosophers[2], which

fought for tuition decreases, criticized Haiti's senators, and held demonstrations

against the government.  Id. at 193, 200.  He claimed to have been the president of

that organization from November 2002 until 2003.  Id. at 200.  Because of his

_____

[1]  Saint-Jour submitted a copy of three poems from his book, Leave My Body: Shadow and Light, that were critical of the Lavalas government.  Id. at 150, 154-55, 157, 159-60.  His poem "Do We Look Alike" included the following verse: "Lavalas has stopped all our resources / All our animals has gone crazy / If you talk you're smashed / You're better off smashed than suffocated."  Id. at 155.  He also criticized the government in some of his other poems, including "Don't Be Shocked" and "Asylum."  Id. at 122, 157, 159.

[2]  In his application, Saint-Jour referred to the student group as "Solidarity Between Philosophers," but at the removal hearing, the group's name was translated as "Solidarity of Philosophers of the Northwest."  Id. at 113, 200.  For the sake of consistency, we refer to it as "Solidarity Between Philosophers."

involvement with Solidarity Between Philosophers, he was accused of opposing the Lavalas party.  Id.

Saint-Jour claimed that Box had threatened his life and stated that he believed that Box or other Lavalas members would kill him if he returned to Haiti.  Id. at 193-94, 200.  He also stated that, before arriving in the United States, he lived in the Bahamas for seven months and wanted to apply for asylum there, but the Bahamian government was deporting many Haitians back to Haiti.  Id. at 195.

Saint-Jour also submitted copies of the U.S. State Department's Haiti Country Report on Human Rights Practices ("Country Report") for 2004 and 2006, as well as a January 2007 travel warning from the U.S. State Department describing security concerns in Haiti.  Id. at 138-48, 172, 174-88.  The 2004 Country Report stated that numerous pro-Lavalas supporters had been arrested or killed.  Id. at 176-80.  The 2006 Country Report noted that President Jean Bertrand Aristide had resigned and left Haiti in February 2004, that a new president was elected in 2006, and that the United Nations had more than 6,000 troops in Haiti to provide security.  Id. at 138.

On 18 May 2005, Saint-Jour appeared before the IJ pro se and stated that he understood the charges against him.  Id. at 77.  At the removal hearing on 30 April 2007, where he was represented by counsel, Saint-Jour testified on direct examination that he joined Solidarity Between Philosophers in January 2002,

4

noting that the group fought for students' rights at Haitian universities. Id. at 113, 115. He stated that he joined the group because education costs were rising and there were no computers for the students, even though Haitian senators were receiving high salaries at the time. Id. at 115. Saint-Jour stated that he was elected president of the group in November 2002. Id. As president from 2003 to 2004, he held meetings and spoke on the radio every week. Id. at 115-16. On 28 February 2003, he participated in a demonstration that drew a crowd of 889 people. Id. at 116. Saint-Jour claimed that the police refused to provide security for the demonstration, and one person was injured when the group was stoned. Id. at 116-18.

Saint-Jour further testified that his uncle, Max Box, was an official member of the Lavalas party, but claimed that he could not get proof of Box's party membership because Box wanted to kill him. Id. at 118-19. Saint-Jour stated that Box wanted to kill him because he published a book of poetry that was critical of the Lavalas party's bad acts. Id. at 119.

Saint-Jour also recounted the 2004 songwriting competition and his 3 March 2004 radio interview about his winning song, entitled "Give Haiti a Chance." Id. at 123-24. He testified that the first person to call the radio station was Box, who threatened to kill him and said that he would be a problem for the government if it did not cut off his wings. Id. at 123. Between ten and twelve other people called

5

the radio station, and people destroyed the stairwells leading to the radio station; however, Saint-Jour was not harmed physically. Id. at 124-125.

Saint-Jour testified that he went into hiding in Cap Haitien from March to September 2004, staying at a house where eleven people lived. Id. at 126. While he was sleeping at the university one night, the other people living in the house were beaten, but he testified that he did not know why they were attacked. Id. at 126-127. From September 2004 to April 2005, Saint-Jour lived in the Bahamas and tried to get legal residency there, but a government official told him it was impossible for Haitians to get legal status at that time. Id. at 127-28. He stated that was afraid to return to Haiti because Lavalas supporters would not forget his writing and because his song was still being played on the radio there. Id. at 128.

On cross-examination, Saint-Jour testified that nothing had happened to his two brothers who were still living in Haiti, and that no one had come looking for Saint-Jour after he left the country. Id. at 129. He stated that the student group Solidarity Between Philosophers was still active but admitted that he had no proof of his membership. Id. at 130. Saint-Jour also acknowledged that the senators that he and the student group criticized were from various parties, not just Lavalas. Id. at 131. He further admitted that he never reported his uncle's death threat to the police and that he had no proof of any of his radio appearances, even though he conceded that the radio station was very easy to get in touch with. Id. at 132, 134.

6

Saint-Jour also testified that although the people who were attacked in the house in which he had been staying did report the attack to the police, he did not have a copy of the report. Id. at 134.

On redirect, Saint-Jour testified that, during the period from March to September 2004, the political atmosphere in Haiti was dangerous, and there was a massacre in St. Marc where a journalist's tongue was cut off. Id. at 135. He also asserted that the police were not functioning normally during that time. Id. at 136.

The IJ denied Saint-Jour's application and ordered him removed to Haiti, finding that he was credible, but that he had not established harm that rose to the level of past persecution. Id. at 52-53, 57-58. The IJ noted that he was never physically harmed, arrested, or detained in Haiti, and determined that Box's single verbal threat over the radio did not rise to the level of persecution under the INA. Id. at 54.

As to future persecution, the IJ found that Saint-Jour credibly testified that he feared persecution and thus demonstrated a subjectively genuine fear of future persecution. Id. However, the IJ noted that Saint-Jour was not entitled to a presumption that his life or freedom would be threatened in the future because he had not proven past persecution. Id. The IJ further observed that Saint-Jour's application was subject to the REAL ID Act of 2005, which required Saint-Jour to provide documentation to clearly establish that he would be persecuted if he were

7

to return to Haiti.  Id. at 54-55.  The IJ noted that while Saint-Jour did submit a copy of the book of poems that he wrote that were critical of Lavalas, he failed to produce evidence of his uncle's membership in Lavalas or any evidence of threats. Id. at 55.  The IJ found that the 2004 Country Report in particular contradicted his claims, because the report identified Lavalas members and supporters as the targets of persecution.  Id.

In terms of an objectively reasonable fear of future persecution, the IJ found that Saint-Jour had not established a reasonable possibility that he would suffer persecution, particularly since Haiti was being governed by a coalition government assisted by the United Nations and there was no indication that the present government would target Saint-Jour based on his prior writings.  Id. at 56. Furthermore, the IJ found that Saint-Jour had not established that he was unable to relocate to another part of Haiti in order to avoid his uncle.  Id.  Because Saint-Jour had not met the lower burden of proof for asylum, he likewise failed to meet the higher burden for withholding of removal.  Id. at 56-57.  The IJ also concluded that Saint-Jour had not shown eligibility for CAT relief.  Id. at 57.

Saint-Jour filed a notice of appeal with the BIA, arguing that substantial, probative, reliable, and uncontradicted evidence established that he would face persecution if he returned to Haiti.  Id. at 37, 39.  In his brief to the BIA, Saint-Jour argued that he established his membership in a group of similarly situated persons

8

who have experienced a pattern or practice of persecution–i.e., opponents of the Lavalas party. Id. at 17-18. He argued that his participation in a demonstration as a student and the publication of his songs and poems criticizing Lavalas showed that he was part of this group. Id. at 18. Furthermore, he argued that he demonstrated past persecution through the evidence that his uncle–a Lavalas official–publicly threatened him, the radio station was attacked on the day of his appearance, his friends were the victims of violent attacks, and his song criticizing the Lavalas party continued to play on the radio in Haiti. Id. at 18, 20.

The BIA dismissed Saint-Jour's appeal from the IJ's denial of his claims, adopting and affirming the IJ's decision. Id. at 2. The BIA agreed with the IJ that any harm experienced by Saint-Jour was insufficient to amount to persecution, and it also found that the evidence was insufficient to establish a well-founded fear of future persecution. Id. Furthermore, the BIA agreed that Saint-Jour failed to establish that he could not internally relocate in order to avoid his uncle, and it concluded that it was not more likely than not that he would be tortured by or with the consent of Haitian government officials if he returned. Id.

## II. DISCUSSION

On appeal, Saint-Jour argues that he established past persecution and a well-founded fear of future persecution on account of his student group membership and his public criticism of Haiti's Lavalas government. Specifically, he asserts that,

considered collectively, threats made against him by his uncle and other Lavalas supporters who called into a radio show on which he was a guest, an attack on that radio station, and an attack on a group of people with whom he shared a house demonstrated past persecution. Because he demonstrated past persecution, Saint-Jour argues that he was entitled to a presumption of a well-founded fear of future persecution. As to withholding of removal, he asserts that the evidence shows that, despite a change in Haiti's government, political violence still exists, and there is a pattern or practice of persecution by Lavalas members against their detractors.

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion. Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citations omitted). In this case, the BIA expressly adopted the IJ's decision. Therefore, we review the IJ's decision as if it were that of the BIA.

"To the extent that the [IJ's] decision was based on a legal determination, [our] review is de novo." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). Factual determinations, however, are reviewed under the substantial-evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). We "must affirm the [IJ's] decision if it is supported by reasonable,

10

substantial, and probative evidence on the record considered as a whole."

D-Muhumed, 388 F.3d at 818 (quotation marks and citation omitted). "To reverse

the IJ's fact findings, we must find that the record not only supports reversal, but

compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

An alien who arrives in or is present in the United States may apply for

asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General or

Secretary of the Department of Homeland Security has discretion to grant asylum

if the alien meets the INA's definition of a "refugee." INA § 208(b)(1)(A), 8

U.S.C. § 1158(b)(1)(A). A "refugee" is:

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion[.]

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving

statutory "refugee" status. See 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 208.13(a);

Al Najjar, 257 F.3d at 1284. To establish eligibility, the alien must, with specific

and credible evidence, establish (1) past persecution on account of a statutorily

listed factor, or (2) a well-founded fear that the statutorily listed factor will cause

future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.

11

Furthermore, "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (quotation marks, citation, and alteration omitted).

To establish a well-founded fear of persecution, the applicant must show that there is a "reasonable possibility" of suffering persecution if he returns to his home country. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation marks, citation, and emphasis omitted). The fear of persecution must be "subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution," and "[i]n most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation marks and citation omitted). "Evidence of group membership, standing alone, cannot compel a finding of a well-founded fear of persecution when the record contains ample evidence to support the contrary finding by the [IJ]." Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1348 (11th Cir. 2008). The alien must show a nexus between a statutorily protected ground and the feared persecution, and he can do so by presenting "specific, detailed facts showing a good reason to fear that he or she

12

will be <u>singled</u> <u>out</u> for persecution on account of" the statutorily listed factor. <u>Forgue v. U.S. Att'y Gen.</u>, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation marks and citation omitted).

However, the alien does not need to prove that he would be "singled out" for persecution if (1) there is a "pattern or practice" of persecution against similarly situated individuals and (2) his or her inclusion within that group of individuals makes fear of persecution reasonable. <u>See</u> 8 C.F.R. § 208.13(b)(2)(iii). "Once the applicant makes an initial showing of fear of future persecution, the government may rebut [his] evidence by demonstrating, based upon a preponderance of the evidence, that the applicant could avoid future persecution by relocating within the country if, under all the circumstances, it would be reasonable to expect the applicant to do so." <u>De Santamaria v. U.S. Att'y Gen.</u>, 525 F.3d 999, 1008 (11th Cir. 2008) (quotation marks and citation omitted).

As an initial matter, Saint-Jour has failed to raise any arguments in his brief concerning the denial of CAT relief. Therefore, he has abandoned that issue. <u>See</u> <u>Sepulveda</u>, 401 F.3d at 1228 n.2.

Saint-Jour has failed to establish past persecution on account of a statutorily listed factor, or a well-founded fear of future persecution. <u>See</u> 8 C.F.R. § 208.13(a) and (b); <u>Al Najjar</u>, 257 F.3d at 1287. First, substantial evidence supports the findings of the IJ and the BIA that Saint-Jour failed to show past persecution

13

because "persecution is an extreme concept."  Sepulveda, 401 F.3d at 1231 (quotation marks and citation omitted) (noting that menacing telephone calls and threats made to the alien, her brother, and members of the group to which the alien belonged were not past persecution).  The allegations Saint-Jour relies upon consist of his participation in a student demonstration, his uncle's threatening telephone call to the radio station, the calls of ten to twelve other people to the radio station, one attack on the radio station's stairwells, and one attack on people sharing a house with him.  AR at 116, 123-24, 126-27.  As to the attack on the house where he was staying, Saint-Jour testified that he did not know why it was attacked and offered no evidence that the attack was related to him.  Id. at 127.  He also testified that he was not harmed during the student demonstration.  Id. at 118.  While the threats and attack on the radio station were related to his criticism of the Lavalas party, the conduct does not compel the conclusion that Saint-Jour suffered past persecution, particularly in light of his testimony that he suffered no physical harm and never received any other threats after his radio appearance.  See Mendoza, 327 F.3d at 1287; AR at 125, 129.  Even in the aggregate, verbal threats on one occasion by his uncle and between ten and twelve other unknown people, an attack on the radio station's stairs, and an attack on a group of people with whom he shared a house do not constitute persecution, especially since Saint-Jour testified that he did not know why his housemates were attacked.  See Delgado v. U.S.

14

Att'y Gen., 487 F.3d 855, 861-62 (11th Cir. 2007) (per curiam) (finding past persecution based on "cumulative effect" of evidence); AR at 123-24, 126-27.

Second, substantial evidence supports the findings of the IJ and the BIA that Saint-Jour failed to demonstrate a well-founded fear of future persecution. Even assuming that he established a subjective fear, substantial evidence supported the finding that his fear was not objectively reasonable. See Al Najjar, 257 F.3d at 1289. Saint-Jour did not suffer past persecution, and the only bases for his claim of fear of future persecution were the threats made to him during his radio appearance on 3 March 2004, and the assertion that his song is still being played in Haiti. AR at 123-24, 128. However, Saint-Jour failed to present evidence of a "pattern or practice" of persecution by the Lavalas party against its detractors–particularly those, like him, who criticized the Lavalas party in a book and a song but were not involved in other anti-Lavalas activities. 8 C.F.R. § 208.13(b)(2)(iii). His fear of being persecuted for his anti-Lavalas views is particularly unreasonable in light of the 2004 Country Report describing violence against Lavalas supporters and the 2006 Country Report's description of the change in government. AR at 138, 176-80.

Because Saint-Jour failed to establish a pattern or practice of persecution, he was required to prove the existence of a "reasonable possibility" that he "would be singled out individually for persecution." 8 C.F.R. § 208.13(b)(2)(i), (iii). Saint-

15

Jour failed to provide sufficient evidence to meet his burden of proof when he testified that he was threatened on 3 March 2004 but has not received a single threat since then, that his brothers continue to live unharmed in Haiti, and that he has never been physically attacked by Lavalas supporters. AR at 123-25, 129. He argues that political violence still exists in Haiti despite the change in government, but evidence of group membership alone cannot compel a finding of a well-founded fear of persecution, and Saint-Jour failed to meet his burden of proving that he would be singled out for persecution. See Mohammed, 547 F.3d at 1348; Forgue, 401 F.3d at 1286. Therefore, Saint-Jour did not meet his burden of showing refugee status on the basis of a well-founded fear of future persecution.

Finally, to qualify for withholding of removal, an alien must establish standards more stringent that those for asylum eligibility. See Sepulveda, 401 F.3d at 1232-33. Consequently, because Saint-Jour could not prove persecution based on a protected ground, as required for asylum relief, he necessarily failed to demonstrate that it was "more likely than not" that he would be persecuted in Haiti, which is the standard applicable to a withholding of removal claim. Id. Therefore, the BIA's finding that Saint-Jour was not eligible for asylum and withholding of removal is supported by substantial evidence.

16

### III. CONCLUSION

Upon review of the record and consideration of the parties' briefs, we conclude that substantial evidence supports the IJ's and the BIA's conclusion that the events described by Saint-Jour were not sufficiently extreme to constitute past persecution, and that he has not shown a reasonable fear of future persecution if he were to return to Haiti. Thus, he is not eligible for asylum, and he necessarily cannot meet the more stringent standards for withholding of removal. Accordingly, we DENY Saint-Jour's petition for review.

**PETITION DENIED.**