[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-12244
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 29, 2010
JOHN LEY
CLERK

Agency No. A096-001-162

GABNER FILS ST. GERMAIN,

                                                        Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 29, 2010)

Before BARKETT, HULL and WILSON, Circuit Judges.

PER CURIAM:

Gabner Fils St. Germain, a native and citizen of Haiti, seeks review of the Board of Immigration Appeals's ("BIA") order, affirming the decision of the immigration judge ("IJ") denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), on the basis of an adverse credibility determination and lack of corroborating evidence. INA §§ 208 & 241, 8 U.S.C. §§ 1158 & 1231; 8 C.F.R. § 208.16(c).

On appeal, St. Germain argues that he suffered persecution in Haiti on account of his political opinion and membership in a particular social group; therefore, he contends that the BIA erred in denying his application for asylum. Specifically, St. Germain argues against the adverse credibility determination, challenging the IJ's fact finding process, and contending that the emphasis on his lack of corroborating evidence was inappropriate. He also asserts that his procedural due process rights were violated during his removal hearing.[1] St. Germain does not raise the denial of withholding of removal or CAT relief on appeal, so he has abandoned these claims. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d

---

[1] St. Germain also seeks a remand to the IJ for consideration of St. Germain's application for adjustment of status. St. Germain did not raise this claim before the BIA in relation to the present petition for review, but has raised this claim in a separate motion to reopen before the BIA. Therefore, this claim is not properly before us at this time.

2

1226, 1228 n.2 (11th Cir. 2005) (per curiam). Upon review of the record and the parties' briefs, we find that substantial evidence supports the BIA's determination that St. Germain's testimony and corroborating evidence before the IJ were not credible and that St. Germain was not substantially prejudiced by the alleged procedural due process violation. Therefore, we deny the petition.

## I. BACKGROUND

In his credible fear interview, St. Germain said that he was a Haitian police officer, a criminal investigator, and a supporter of the Organization of People in Struggle ("OPL"), a human rights organization. St. Germain also stated that he was a lawyer who represented the OPL. St. Germain said that in Haiti, he investigated the murder of his friend and police officer, Ricardo Benjamin. Benjamin was a member of the OPL and criticized human rights abuses by the police. St. Germain accused the police of committing this murder, and then he was threatened with death by the government and the government's political party. St. Germain stated that he feared the government because he supported the OPL and because he spoke out against the death of his friend.

In his asylum application, St. Germain stated that in Haiti he was associated with the Federation of Student University of Haiti ("FEU"), an organization that criticized the country's condition. He stated that after he wrote a police report implicating the police in the assassination of Benjamin, he received telephone calls

3

accusing him of working for the "Convergence" and threatening his life. In his attached statement, St. Germain stated that he was placed on the team that led the investigation into Benjamin's murder as a criminal investigator. The investigation convinced St. Germain that the police assassinated Benjamin as a result of his opposition to the police. Ultimately, St. Germain was dismissed from the investigation and encouraged to leave the country. He felt that his life was in danger, and another member of the investigation team was murdered.

In support of his application, St. Germain submitted, *inter alia*, a letter dated June 7, 2003, to St. Germain from the police commissioner in the area in which Benjamin was killed, congratulating him on his service as a police investigator and requesting the records related to the Benjamin investigation. He also submitted a copy of an internet article dated April 12, 2002, on Benjamin's murder.

At St. Germain's removal hearing, St. Germain testified that he was a trained criminal investigator, that he graduated from law school, and that he continued as a university student until he left Haiti. When he was in school, he was a member of the FEU, and he worked as a police officer. He stated that he conflicted with other police officers in the student protests, and as a result, received personal threats. With regard to Benjamin's investigation, he stated that he received threatening phone calls, and then some people searched his mother's house and took all of his documents. During this search, the police ransacked the house, and they pulled a

4

weapon on his mother. On cross-examination, St. Germain testified that he received the letter from the police commissioner asking for the results of the Benjamin investigation in April 2002, before he submitted his report. The government then asked him why the letter was dated June 7, 2003, after St. Germain was in the United States and no longer on the Haitian police force. St. Germain replied that there is not a set time frame for an investigation to end. St. Germain acknowledged that he did not have any other proof that he was an investigator for Benjamin's murder, and although he submitted his report to a supervisory official, he did not know what the final official report concluded about the murder.

When questioned about his political affiliations, he testified that he was only a member of FEU, but did not mention OPL. Later, St. Germain stated that FEU was affiliated with OPL. The government asked if anyone had mistreated his family that remained in Haiti, and St. Germain replied, "Yes. My family was threatened." When asked if his family had been physically mistreated, he replied, "No."

The government then discovered certain documents, which had been retrieved from St. Germain when he was initially detained, in the government's file. These documents, which included his police I.D. card and an OPL membership card, had not been previously submitted to the court or shown to St.

5

Germain's attorney. The government then showed the documents to St. Germain and again inquired about his membership in OPL, when he testified only to membership in FEU. St. Germain stated that FEU gave him the card, and OPL and "all those parties together" make up "Convergence," a group which fights for human rights, and that the card did not say FEU because "they didn't want the faculty mingling with the political party."

On July 8, 2004, the IJ denied St. Germain's application for relief on the basis that his testimony was not credible. On November 1, 2005, the BIA determined that the tape recordings of the removal hearing contained indiscernible information and returned the record to the IJ to take the necessary steps "to enable preparation of a complete transcript . . . including a new hearing, if necessary." On remand, St. Germain submitted a transcript on which corrections and explanations of the indiscernible portions were written in by hand. The government objected to these corrections on the ground that they were not corrections, but explanations to what was said at the hearing. The IJ specifically approved some of the corrections, and the transcript was revised to include only the approved corrections. The IJ granted a new hearing to give St. Germain an opportunity to explain any of the answers that were included in the transcript.

Before the second hearing, St. Germain, represented by new counsel, submitted the U.S. State Department's Haiti Country Report on Human Rights

6

Practices for 2006, together with multiple other reports and articles about police corruption and human rights abuses in Haiti. He submitted a letter from the United Nations Haiti Mission stating that St. Germain was a police investigator, and a police report filed by his mother regarding the search of her home. St. Germain also submitted an internet report dated February 2002 which appeared to have the same content as the internet article submitted with the asylum application. During his testimony, St. Germain stated that his wife was pregnant, and after his house was searched as a result of the Benjamin investigation, his wife went to the police station and called one of the policemen a "thug," at which point, the policeman kicked his wife in the belly. She started bleeding, and she miscarried. He stated that his mother told him that during the search of his home, men entered forcibly, shot at the walls, made her lay down on her stomach, put their feet on top of her legs, and threatened her with death. St. Germain also stated that he spoke on the radio, distributed flyers, interacted with the people, and received many threats as a result of his involvement in the Convergence and related organizations, such as OPL and FEU.

After recounting the differences between St. Germain's testimony at the two hearings and the differences between the testimony and the asylum application, the IJ concluded that St. Germain was not credible, and that St. Germain had

"changed the focus of his fears" because his testimony emphasized his political activity, while his application relied on his participation in the Benjamin investigation. Thus, the IJ determined that St. Germain had not met his burden of proof with respect to asylum, withholding of removal, or CAT relief. The BIA affirmed, first determining that the IJ's adverse credibility finding was not clearly erroneous, and concluding that any error relating to the introduction of the documents from the detention proceeding was harmless and not prejudicial. The BIA dismissed the appeal.

## II. STANDARD OF REVIEW

We review the BIA's decision unless the BIA expressly adopted the IJ's decision. *Ruiz v. Gonzales*, 479 F.3d 762, 765 (11th Cir. 2007) (citation omitted). Here, since the BIA issued its own opinion upholding the IJ's adverse credibility finding and the denial of asylum, we will only review the BIA's decision.

"The BIA's factual determinations are reviewed under the substantial evidence test, and [we] must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 817–18 (11th Cir. 2004) (quotation and citation omitted). "Credibility determinations likewise are reviewed under the substantial evidence test." *Id.* at 818. "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the BIA with

8

respect to credibility findings." *Id.* (citation omitted). Under the highly deferential

substantial evidence test, we will not reverse an adverse credibility finding unless

"the evidence 'compels' a reasonable fact finder to find otherwise." *Chen v. U.S.*

*Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam) (citation and

quotation omitted). "Furthermore, [u]nder the substantial evidence test, we review

the record evidence in the light most favorable to the agency's decision and draw

all reasonable inferences in favor of that decision." *Forgue v. U.S. Att'y Gen.*, 401

F.3d 1282, 1286 (11th Cir. 2005) (alteration in original) (citation and quotation

omitted). We review legal determinations of the BIA *de novo*. *Delgado v. U.S.*

*Att'y Gen.*, 487 F.3d 855, 860 (11th Cir. 2007) (per curiam) (citation omitted).

## III. DISCUSSION

### A. Adverse Credibility Determination

An alien is eligible for discretionary asylum relief if the alien is a "refugee"

within the meaning of INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). INA

§ 208(b)(1)(A), 8 U.S.C. §1158(b)(1)(A). A "refugee" is defined as

> any person who is outside any country of such person's nationality . . .
> and who is unable or unwilling to return to, and is unable or unwilling
> to avail himself or herself of the protection of, that country because of
> persecution or a well-founded fear of persecution on account of race,
> religion, nationality, membership in a particular social group, or
> political opinion[.]

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). The asylum applicant bears the burden of proving that he qualifies as a "refugee." 8 C.F.R. § 208.13(a). In order to meet this burden, "the applicant must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground." *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1256 (11th Cir. 2007) (citations omitted).

"The asylum applicant must establish eligibility for asylum by offering credible, direct, and specific evidence in the record." *Forgue*, 401 F.3d at 1287 (quotation omitted). "[A]n adverse credibility determination alone may be sufficient to support the denial of an asylum application." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006) (per curiam) (citation and quotation omitted). We have held that decisions about credibility must be based on "clean determinations" by the fact finder. *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) (citation omitted). "Further, the [fact finder] must offer specific, cogent reasons for an adverse credibility finding." *Forgue*, 401 F.3d at 1287. "[A]n adverse credibility determination does not alleviate the [fact finder's] duty to consider other evidence produced by an asylum applicant." *Id.* However, "[o]nce an adverse credibility finding is made, the burden is on the applicant alien to show that the . . . credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." *Id.* (quotation omitted).

10

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Ruiz*, 440 F.3d at 1255. In *Chen*, we upheld an adverse credibility determination where the IJ cited "a number of inconsistencies and discrepancies between Chen's asylum application, his credible fear interview, and his testimony at the removal hearing." 463 F.3d at 1232.

The alien's testimony, "if credible, may be sufficient to sustain the burden of proof [for asylum] without corroboration." 8 C.F.R. § 208.13(a); *Forgue*, 401 F.3d at 1287 (citation omitted). "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." *Yang*, 418 F.3d at 1201 (citation omitted).

Substantial evidence supports the BIA's conclusion that the IJ's adverse credibility finding was not clearly erroneous. First, the record supports each of the inconsistencies identified by the BIA. At the first hearing and in his asylum application, St. Germain's claim of persecution was primarily from the police based on his investigation of Benjamin's death. However, at the second hearing, the focus of St. Germain's fears shifted to the governmental regime as a result of his general political involvement. At the second hearing, St. Germain raised new information regarding his political activities, including radio broadcasts and police stops, with no clear explanation as to why this information was omitted from his

11

application and the first hearing. At the second hearing, he raised new explanations for the inconsistencies in his statements that he belonged only to OPL, and then only to FEU. Significantly, the record supports the inconsistency in St. Germain's testimony regarding his family's physical mistreatment. He first testified that no one was physically mistreated, and at the second hearing, he provided testimony regarding his pregnant wife's loss of a baby due to mistreatment by the police, the source of his fear of persecution. He first testified that his mother's home was ransacked and guns were drawn, but this differs from the detailed second account involving shooting and physical force. Viewing the record in the light most favorable to the agency and drawing all reasonable inferences in favor of that decision, a reasonable fact finder would not be compelled to reverse the BIA's finding that St. Germain's testimony was not credible. *See Forgue*, 401 F.3d at 1287.

Also, the record supports the BIA's conclusion that St. Germain did not submit corroborative evidence to support his claim of persecution. St. Germain was unable to provide a copy of his investigative report into Benjamin's death or any other evidence regarding his participation in that investigation, even though he was able to obtain other documentation from Haiti. The letter that he did submit from the police commissioner requesting the report was unreliable because vague and non-specific reasons were given as to why it was dated so long after St.

12

Germain had left Haiti. St. Germain submitted no evidence of Benjamin's death, other than two internet articles that were also unreliable. St. Germain did not submit verification of the death of the other investigator, nor evidence that he had reported any incident to officials. Further, although St. Germain testified about his political activity through the radio broadcasts, he did not submit any verification of this testimony. Given the weakness of his testimony, strong corroborative evidence was needed to sustain his burden of proof for asylum relief, but instead, his evidence detracted from his claim. *See Yang*, 418 F.3d at 1201.

Upon review of the record and consideration of the parties' briefs, we conclude that substantial evidence supports the BIA's conclusion that the IJ's adverse credibility finding was not clearly erroneous. Also, the record supports the BIA's conclusion that St. Germain did not submit sufficient corroborative evidence to support his claim of persecution. Without credible testimony or sufficient corroborative evidence, the record does not compel a finding that St. Germain demonstrated past persecution or a well-founded fear of future persecution on account of a protected ground, and the present petition fails.

**B.    Procedural Due Process**

"It is well settled that individuals in deportation proceedings are entitled to due process of law under the Fifth Amendment." *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007) (citation omitted). However, "[t]o prevail on a

13

procedural due process challenge, the petitioner must show that he was substantially prejudiced by the violation." *Id.* (citations omitted). An alien can demonstrate substantial prejudice by showing that, in the absence of the due process violation, "the outcome would have been different." *Ibrahim v. INS*, 821 F.2d 1547, 1550 (11th Cir. 1987).

St. Germain's procedural due process argument fails because he does not show that substantial prejudice resulted from any alleged procedural error. The record reveals that the government did not actually realize that the documents were in the file until a series of questions from the IJ led the government to that discovery. When the documents were discovered, they were shown to the court and to St. Germain, and the court then gave St. Germain a chance to explain on re-direct examination. Significantly, this evidence belonged to St. Germain, was on his person when he arrived in the United States, and was originally obtained from him; thus, he is presumed to know of its existence. The evidence did not reveal a new substantive inconsistency. Thus, St. Germain was not prejudiced by this evidence; therefore, he cannot prevail on his due process argument.

## IV. CONCLUSION

Substantial evidence supports the BIA's opinion, and St. Germain was not substantially prejudiced by the alleged procedural due process violation. Accordingly, we deny the petition.

14

**PETITION DENIED.**