[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 09, 2010
JOHN LEY
CLERK

No. 09-15288
Non-Argument Calendar

_____

Agency Nos. A098-734-752
A098-734-753

NEIKA ROSA RIERA-LEONARDEZ,
JOSE DE JESUS NAVAS-BENITEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 9, 2010)

Before TJOFLAT, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

Neika Rosa Riera Leonardez ("Leonardez") and her husband, Jose de Jesus Navas-Benitez, natives and citizens of Venezuela, seek review of the Board of Immigration Appeals' ("BIA") final order affirming the immigration judge's ("IJ") denial of their application for withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).[1]  After review of the record and the parties' briefs, we DENY the petition.

## I. BACKGROUND

Leonardez was admitted to the United States on or about 22 June 2003 as a non-immigrant visitor with authorization to remain in the United States until 22 December 2003.  Administrative Record ("AR") at 246.  On 16 March 2005, Leonardez filed an application for asylum, withholding of removal, and CAT relief based on political opinion and membership in a particular social group.  *Id.* at 188-200.  The Department of Homeland Security served Leonardez with a Notice to Appear ("NTA") on 6 June 2005, charging her with removability under

---

[1] The BIA also affirmed the IJ's finding that Leonardez's claim for asylum was untimely filed.  *See id.* at 15.  Although Leonardez abandoned the timeliness issue by not challenging in her petition for review the IJ's determination that her asylum application was time-barred, we are in any event without jurisdiction to review this determination.  *See* 8 U.S.C. § 1158(a)(3) (2010); *Sanchez Jimenez v. U.S. Atty. Gen.*, 492 F.3d 1223, 1231 (11th Cir. 2007) (this court lacks jurisdiction under 8 U.S.C. § 1158(a)(3) to review decisions of the Attorney General regarding whether an alien timely filed an application for asylum, or established extraordinary circumstances to excuse an untimely filing).

2

INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for having remained in the United States for a time longer than permitted. *Id.* at 246-47.[2]

In her application, Leonardez stated that she was born in November 1971, and raised in Valencia, State of Carabobo, Venezuela. *Id.* at 197. She became politically active when she was twenty-years-old, and joined Party Project Venezula in 1998 because she identified with its ideology. From 2000 to 2003, Leonardez worked for the state of Carabobo in the financial department of the Ministry of Home Affairs and also worked as an independent advisor in the insurance field. When Hugo Rafael Chavez Frias ("Chavez"), Venezuela's current president, took office, Project Venezuela became the government's opposition. In February 2002, Project Venezuela designated Leonardez as the Neighborhood Logistic Coordinator due to her participation in pro-democratic political activities. *Id.*

Leonardez alleged that her problems began on 16 July 2002, when individuals from the Bolivarian Circles entered her office at the Ministry of Home Affairs in Carabobo and began threatening her, insisting that she stop the campaign against the government and warning her that if she continued with the campaign, she would be considered "an enemy of the regime." *Id.* at 198. She stated that on

---

[2] Leonardez admitted the allegations in the NTA and conceded removability at an initial hearing before an IJ. *See id.* at 85.

10 October 2002, she was participating in a peaceful protest against the government when individuals wearing red bonnets arrived and began shouting at the demonstrators, accusing them of being "traitorous oligarchs of the powerful social classes." *Id.* "[T]urmoil" ensued, resulting in many of the demonstrators being assaulted." *Id.* Leonardez stated that she "denounced" the incident, but "nothing was done to placate these destabilizing individuals." *Id.*

Leonardez further alleged that at about 6:00 p.m. on 27 December 2002, unknown individuals entered her home, "subdued all . . . who were there," and told Leonardez that they would kill her because she had not heeded their warnings. *Id.* The individuals then hit her several times, fracturing her rib. *Id.* Leonardez's mother and uncle took Leonardez, whom the assailants had left unconscious, to a clinic. *Id.* at 198-99. Leonardez tried to file a report, but the authorities "did not proceed with it." *Id.* at 199.

In February 2003, Leonardez began to receive threatening phone calls at both her home and office. The callers, whom Leonardez could not identify, threatened to kill her for actively opposing Chavez. *Id.* On 7 March 2003, three unknown individuals approached Leonardez as she was leaving her office at the Ministry of Home Affairs, called her by name, and told her that "this was the last time [she] would be warned, and that if [she] wanted to keep alive [she] would have to give up making [herself] known as opposition to the regime of President

4

Chávez." *Id.* One of the individuals then grabbed her arm and hit her "forcefully" in her face, knocking her to the ground and causing a hematoma to form in her left eye. *Id.* After she reported the incident to authorities, she went to live with her aunt in Puerto Cabaello. *Id.* On 1 April 2003, her mother received a phone call from a man who identified himself as a civil servant of the government. He told her mother that "they . . . knew [Leonardez] was in Puerto Caballo and would look for [her] wherever [she] was, anywhere in the country." *Id.* Leonardez stated that she returned to Valencia to be with her family, reported these events to the appropriate authorities and to the media, "but each time more force and persecution against [her] was clear and imminent." *Id.* Leonardez resigned from her job on 15 May 2003, and applied for a visa to the United States to be with her husband, who was still her fiancée at the time. *Id.* at 200. When Leonardez arrived in the United States, she discovered that she was pregnant. *Id.*

In support of her asylum application, Leonardez submitted the following documentary evidence: (1) a letter verifying her employment as an account executive in the Valencia Agency since 2 February 2001, *id.* at 168; (2) a police report of the 7 March 2003 incident in which she was struck in the face by unknown assailants, *id.* at 171; (3) a police report of the 10 October 2002 incident, stating that government supporters had "assaulted [Leonardez] with a blunt object (pike) on the back," *id.* at 174; (4) a medical report verifying that Leonardez was

5

admitted for treatment on 27 December 2002 "with the diagnostic presumption of generalized beatings and fracture of one rib," *id.* at 177; (5) a medical report stating that Leonardez was admitted for treatment on 7 March 2003, "with the diagnostic presumption of bruises on the face and hematoma on the left eye," and was held in observation for twenty-four hours, *id.* at 180; (6) a letter issued by the Office of the Governor, State of Carabobo, Police of Municipality, Valencia, verifying that Leonardez worked as an administrator in the Department of Finance from 15 February 2000 to 15 May 2003, *id.* at 183; and (7) a 2002 written notification from Project Venezuela's National Coordinator certifying that Leonardez was an active member of the organization and announcing that she had been promoted to the position of Neighborhood Logistic Coordinator, *id.* at 186.

The record also contained the 2007 U.S. State Department's Country Report on Human Rights Practices for Venezuela ("Country Report"). *See id.* at 148-62. The Country Report stated that voters reelected Chavez in December 2006 in a generally free and fair election, with some irregularities. *Id.* at 148. There were no reports that the government or its agents committed any politically motivated killings, and there were an estimated eleven political prisoners in the country. *Id.* at 148, 151. Some non-governmental organizations ("NGO") expressed concern over official political discrimination against, and the firing of, state employees whose views differed from those of the government. *Id.* at 152.

At her removal hearing, Leonardez gave the following testimony. In 1998, she joined the political party Project Venezuela because she "thought their democratic ideas were the . . . best ones." *Id.* at 100. She was an activist within the party and in February 2002 was named logistics coordinator. *Id.* at 101-02. In this capacity, she organized the party's events, coordinated with the press, and kept minutes of party meetings, which were held two days per week. *Id.* Leonardez then discussed the incidents she described in her asylum application. With respect to the 10 October 2002 demonstration, Leonardez testified that she was poked "[w]ith a knife, with a penetrating weapon," but it did not draw blood. *Id.* at 107. She also testified that she started receiving threatening phone calls "[s]ince the beginning" and that the callers said they were going to kill her. *Id.* at 108. With respect to the December 2002 incident, she stated that her mother and uncle were present when two men entered her apartment. *Id.* at 109. After the men forced her mother and uncle into the kitchen, they started hitting Leonardez, threw her to the ground, broke one of her ribs, and left her unconscious on the floor. *Id.*

On cross-examination, counsel for the government asked Leonardez why she chose to affiliate with Projecto Venezula and not another political party. Leonardez responded that "[t]heir ideology was very democratic. They had very democratic principles based on laws." *Id.* at 116. When asked to be more specific, Leonardez replied: "They were based on laws, their politics and their ideology, it

7

was for freedom of speech." *Id.* When counsel asked how that differed from other parties and why she "pick[ed]" Projecto Venezuela, Leonardez replied that she "identified with them." *Id.* at 116-17. Leonardez explained that although many political parties also favored freedom of expression, she had friends in Projecto Venezula and had participated in their campaigns. *Id.* When asked about the letter Project Venezuela had written indicating that Leonardez was an active member of the party, Leonardez stated that she thought it was written in 2000 but was not sure about the date. *Id.* at 117-19. When counsel pointed out that the letter mentioned her 2002 appointment as logistics coordinator and asked how the letter could therefore have been written in 2000, Leonardez responded, "I imagine it's a mistake." *Id.* at 119-20.

Leonardez further testified that she began receiving threatening phone calls in August 2002. *Id.* at 125-26. When asked why she stated in her asylum application that she started receiving phone calls in February 2003, she replied: "It's possible that I didn't mention the previous phone calls, but in February, the phones calls were more aggressive." *Id.* at 125-26. With respect to the December 2002 assault, Leonardez testified that she did not have the x-rays that were taken of her rib following the incident, and that it did not occur to her to see a doctor in the United States to verify that her rib had been fractured. *Id.* at 126. Counsel then asked Leonardez why she did not submit a declaration from her mother or uncle,

8

whom she alleged were present at her home on 27 December 2002 when the attack occurred, confirming the attack. *Id.* at 132. Leonardez stated that "[i]t never . . . occur[red] to [her]." *Id.* Leonardez indicated that the door to her apartment had not been locked at the time of this incident, explaining that while the crime rate was high in many parts of Venezuela, there was not a lot of crime in her area, and it was customary, especially where she lived, to keep doors "open, so that anybody c[ould] come in." *Id.* at 134-35.

With respect to the March 2003 attack, Leonardez testified that she was struck in the eye at approximately "4:00, 4:30, 4:20, 4:30," and got to the hospital at around 6:00 or 7:00 p.m. *Id.* at 126-27. She stated that she was discharged the same night, although she did not recall the exact time she left the hospital. *Id.* at 127. When counsel asked her to explain why the medical report indicated that she was kept under observation for twenty-four hours, Leonardez responded that she was under observation for "a time, . . . but it wasn't [twenty-four] hours." *Id.* Leonardez later clarified that she was kept for observation "for probably [ten] hours. *Id.* at 131.

The IJ issued an oral decision, finding that Leonardez failed to testify credibly and denying her application for withholding of removal and CAT relief accordingly. *Id.* at 52-54. The IJ cited the following in support of his adverse credibility determination: (1) Leonardez could not clearly articulate the political

9

ideology of Project Venezuela even though she was given a number of opportunities to do so; (2) Leonardez stated in her application that the telephone threats began in February 2003, but testified that the calls started in 2002; (3) Leonardez testified that she spent only a few hours in the hospital after the 7 March 2003 incident, but the doctor's note indicates that she was kept under observation for twenty-four hours; (4) although Leonardez submitted a police report regarding the December 2002 incident, she did not provide statements from her uncle and/or mother to corroborate the incident, nor did she provide any medical evidence from the United States to corroborate that she suffered a broken rib during the assault; and (5) Leonardez testified that she had been previously attacked and had received telephone threats, "yet, on December 27, 2002, she testified that her door was left open, and the individuals just walked in and abused her." *Id.* at 52-53. The IJ further found that Leonardez's fear of future harm "[was] not substantiated by documentary evidence regarding country conditions in Venezuela." *Id.* at 54.

The BIA affirmed, holding that there was no clear error in the IJ's determination that Leonardez was not credible based on

> inadequately-explained discrepancies between her testimony and her application and supporting materials concerning when she began receiving threats and how long she was in the hospital following the March 7, 2003, incident; and (2) implausible testimony about her lack of knowledge about the political organization to which she allegedly

10

belonged and her failure to lock her door at the time of the December 2002 incident despite claiming a prior attack and threats.

*Id.* at 21. The BIA found that Leonardez's "generic allegations of error" were insufficient to demonstrate that the IJ's adverse credibility finding was not based on specific, cogent reasons, or was clearly erroneous. *Id.* The BIA further noted Leonardez's failure to provide corroborating evidence and to assert a "substantive, cogent challenge on appeal" to the IJ's denial of CAT relief. *Id.* Leonardez now seeks review of the BIA's final order.

## II. DISCUSSION

On appeal, Leonardez argues that the IJ's adverse credibility finding was not supported by specific and cogent reasons. *Id.* at 22-23. Specifically, she contends that: (1) the alleged discrepancies cited by the IJ were trivial and did not go to the core of her claim for relief; (2) the IJ failed to take into account relevant and persuasive evidence that explained the inconsistencies and supported her allegations of political persecution by the Bolivarian Circles; and (3) the IJ should have asked her follow-up questions if he had concerns about her responses to the government's questions regarding Project Venezuela's political ideology, which were misleading and vague. *Id.* at 17.

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir.

11

2001). To the extent that the BIA adopts the IJ's reasoning, we review the IJ's decision as well. *See id.* Because the BIA agreed with the IJ's adverse credibility determination, we review the decisions of both the IJ and the BIA with regard to that issue. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009).

We review the IJ's and BIA's legal conclusions *de novo* and their factual findings under the substantial evidence test, which requires us to affirm the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation marks and citation omitted). Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision "unless [a] reasonable adjudicator would be compelled to conclude to the contrary." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*) (quoting 8 U.S.C. § 1252(b)(4)(B)). Accordingly, "even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision." *Id.* at 1029.

To establish eligibility for withholding of removal under the INA, an applicant bears the burden of proving that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected

ground. *Fahim v. U.S. Att'y Gen.*, 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam) (quotation marks and citation omitted); 8 C.F.R. § 208.16(b)(2). To qualify for CAT relief, an applicant must show that it is more likely than not that he will be tortured if removed to the designated country of removal. 8 C.F.R. § 208.16(c)(2).

An applicant's testimony may be sufficient, without corroboration, to sustain this burden, so long as the trier of fact is satisfied that the applicant's testimony is credible. *See* 8 C.F.R. § 208.16(b), (c)(2). On the other hand, an adverse credibility determination alone is sufficient to support the denial of relief where the applicant produces no evidence other than his own testimony. *See Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). Where the applicant does produce other evidence of persecution, however, the BIA *must* consider that evidence and may not rely solely on an adverse credibility determination to deny relief. *See id.* (explaining that "an adverse credibility determination does not alleviate the [BIA]'s duty to consider other evidence produced by an asylum applicant").

"Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." *Forgue*, 401 F.3d at 1287 (quotation marks and citation omitted). "Indications of reliable testimony

13

include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006) (per curiam). The BIA's credibility determination, like any other finding of fact, is reviewed for substantial evidence and may not be overturned unless the record compels it. *Id.*

The IJ and BIA articulated specific and cogent reasons for the adverse credibility determination. Although we have not adopted the "heart of the claim" analysis, which Leonardez urges applies in this case, the inconsistencies and implausible testimony on which the BIA relied are material and go to the heart of her claim. Leonardez's application revolved around factual allegations that she vigorously participated in the political party Project Venezuela and, as a direct consequence of such participation, was subjected to threats and physical injury amounting to persecution. Leonardez's knowledge of the political ideology of Project Venezuela and the details surrounding the incidents of claimed persecution, therefore, are directly related to her claims for withholding of removal and CAT relief on the basis of her political opinion.

Other evidence in the record also supports the adverse credibility determination. For instance, both Leonardez's asylum application and the letter from the Governor's Office stated that Leonardez worked in the financial department of the Ministry of Home Affairs for the Carabobo government from

2000 to 2003. *See id.* at 183, 197. Leonardez testified, however, that she worked for the Ministry of Home Affairs from 2002 to 2003. *See id.* at 98-99. Additionally, Leonardez testified at the removal hearing that "[t]hey poked [her] . . . [w]ith a knife, with a penetrating weapon" during the 10 October 2002 demonstration, but failed to allege in her asylum application that she was personally assaulted that day. *Id.* at 107, 198. In light of these inconsistencies and implausibilities, we cannot say that the record compels reversal of the BIA's conclusion that Leonardez was not credible. Because the IJ and BIA considered the documentary evidence submitted by Leonardez in support of her claim, their adverse credibility determination, which was supported by specific and cogent reasons, was alone sufficient to justify denial of withholding of removal and CAT relief. *See Forgue*, 401 F.3d at 1287.

## III. CONCLUSION

Substantial evidence supports the IJ's and BIA's determination that Leonardez was not credible, and nothing in the record would compel a reasonable fact finder to conclude otherwise. Accordingly, we **DENY** Leonardez's petition for review of the BIA's decision dismissing his appeal from the IJ's denial of withholding of removal and CAT relief.

**PETITION DENIED**.

15